

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 98-7256-CIV-MOORE

JANNERAL DENSON and JORDAN L.
TAYLOR, a minor, through his
legal guardian, JANNERAL DENSON,

     Plaintiffs,

v.

UNITED STATES OF AMERICA, etc.,
et al.,

     Defendants.

_____/

## NOTICE OF APPEAL

**NOTICE** is hereby given that the Plaintiffs in the above named case, hereby appeal to the United States Court of Appeals for the Eleventh Circuit from the District Court's Findings of Fact and Conclusions of Law dated August 5, 2005, in which judgment was entered for Defendant UNITED STATES OF AMERICA. (Exhibit A).

**WE HEREBY CERTIFY** that a copy of the foregoing has been furnished by U.S. mail to: Lawrence Rosen, Esq., Assistant U.S. Attorney, 99 NE 4 Street, 3rd Floor, Miami, FL 33132-2111 and James J. Allen, Esq., Office of the County Attorney, 111 NW 1

Street, Suite 2810, Miami, FL  33128-1993 this ____ day of

October, 2005.

                    HEYER & ASSOCIATES, P.A.
                    Attorneys for Plaintiffs
                    1311 SE 4th Avenue
                    Fort Lauderdale, FL   33316
                    (954) 522-4922 / (561) 833-1068
                    FAX NO.: (954) 522-4955

                    BY: _____
                        BARBARA A. HEYER
                        BAR NO.: 346691

2

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.98-7256-CIV-MOORE

JANNERAL DENSON and JORDAN L.
TAYLOR, a minor, through his
legal guardian, JANNERAL DENSON

    Plaintiff(s),

v.

UNITED STATES OF AMERICA, et al.,

    Defendant(s).

_____/



### FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE comes before the Court for final disposition after a four-day bench trial in Miami, Florida, from April 18, 2005, through April 21, 2005. Plaintiff filed this action against the United States of America seeking damages under the Federal Torts Claims Act ("FTCA") for circumstances surrounding her detention by United States Customs officials at the Ft. Lauderdale International Airport on February 14, 1997.

The Court, having heard four days of trial testimony, having reviewed the applicable pleadings, received evidence, and reviewed the applicable law, makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACT

1.    Plaintiff Janneral Denson is an American citizen residing in Boyton Beach, Florida. Tr.



PLAINTIFF'S
EXHIBIT
A

394
4H

Denson, April 21 at 129.[1]

2.   On February 14, 1997, Plaintiff Janneral Denson, who was approximately six months pregnant, arrived at the Fort Lauderdale International Airport following a brief trip to Jamaica. Tr. Friedland, April 18 at 59; Pl. Trial Ex. 1; Tr. Denson, April 21 at 146-148; Tr. Denson, April 21 at 165.

3.   Plaintiff traveled from Miami to Jamaica on the evening of Wednesday, February 12, 1997 and returned on an unscheduled Air Jamaica flight to the Fort Lauderdale airport on the afternoon of Friday, February 14, 1997. Tr. Friedland, April 18 at 59-61; Pl. Trial Ex. 1; Tr. Denson, April 21 at 146-148.

4.   The total length of Plaintiff's trip was approximately one full day.  Tr. Friedland, April 19 at 96; Pl. Trial Ex. 1.

5.   Jamaica is known to Custom's inspectors as a source country for smuggling narcotics into the United States. Tr. Friedland, April 18 at 62; Tr. Smith, April 20 at 102, 129; Tr. Fortin, April 21 at 16; Tr. Cappuccio, April 21 at 32-33.

6.   South Florida is considered an entry point into the United States for narcotics from source countries. Tr. Fortin, April 21, at 16.

7.   When there is a flight arriving from a source country, United States Customs inspectors are

---

[1]Under Florida law a child born alive, having suffered prenatal injuries at any time after conception, has a cause of action against the alleged tortfeasor. If the child is born alive, there is a relation-back to the time of injury in order for the infant person to maintain its cause of action. Day v. Nationwide Mut. Ins. Co., 328 So. 2d 560, 562 (Fla. Dist. Ct. App. 1976).  In essence, Plaintiff Jordan Taylor's claims of assault and battery, false imprisonment/arrest, intentional infliction of emotional distress and invasion of privacy, are derivative of United States Customs officials' treatment of Janneral Denson.  This Court, therefore, focuses on the treatment of Plaintiff Janneral Denson.

on high alert. Tr. Flynn, April 19 at 145; Tr. Fortin, April 21 at 14-20; Tr. Friedland, April
19 at 88, 96, 106; Tr. Cappuccio, April 21 at 32.

8.   Plaintiff entered the United States with no luggage and carried only a purse and a small to
     medium sized bag. Tr. Denson, April 21 at 141, 142, 148.

9.   Plaintiff passed through the primary customs inspection without incident. Tr. Denson, April
     21 at 148-149.

10.  Subsequently, Senior Inspector Friedland ("SI Frieldand"), who was posted at a secondary
     Customs station, observed Plaintiff quickly exiting the Customs area and avoiding eye
     contact. Tr. Friedland, April 18 at 71; Tr. Friedland, April 19 at 88-89.

11.  SI Friedland further noted that Plaintiff was pregnant and was traveling with no luggage. Id.

12.  United States Customs inspectors were aware of a smuggling trend in which pregnant women
     were recruited as drug couriers because they were less likely to be detected by United States
     Customs as drug couriers. Tr. Friedland, April 19 at 106-107; Tr. Lavenka, April 20 at 71;
     Tr. Cappuccio, April 21 at 37; Tr. Smith, April 20 at 132-133; Tr. Fortin, April 21 at 19-20.

13.  Furthermore, Customs is unable to x-ray a pregnant women to determine if they are internal
     narcotics couriers. Id.

14.  SI Friedland called out to Plaintiff, but Plaintiff did not halt. Tr. Friedland, April 18 at 71;
     Tr. Friedland, April 19 at 90.

15.  SI Friedland quickly moved toward Plaintiff. Tr. Friedland, April 19 at 90.

**SECONDARY BELT**

16.  When SI Friedland caught up with Plaintiff, she escorted Plaintiff to the secondary belt for

questioning. Tr. Friedland, April 19 at 60, 91.[2]

17.   SI Friedland began asking Plaintiff routine Customs questions which Plaintiff had difficulty

answering. Tr. Friedland, April 18 at 71.

18.   When asked about the purpose of her trip, Plaintiff stated that she went to see her husband,

Richard Scott, in Jamaica. Tr. Friedland, April 19 at 94; Tr. Denson, April 21 at 152.

19.   At trial Plaintiff further explained that she went to see her husband because they had an

appointment with Jamaican immigration officials to obtain a visa for him to come to the

United States. Tr. Denson, April 21 at 152.

20.   SI Friedland testified that she could not recall if Plaintiff had told her that she was having a

meeting with Jamaican authorities to obtain a visa for Richard Scott. Tr. Friedland, April

19 at 39.

21.   Plaintiff initially could not tell SI Friedland where Plaintiff's husband lived. Tr. Friedland,

April 18 at 77; Tr. Friedland, April 19 at 94.

22.   Plaintiff later stated that her husband lived in a parish in Jamaica. Tr. Friedland, April 19

at 95.

23.   SI Friedland asked Plaintiff how she contacted her husband. Tr. Friedland, April 18 at 77;

Tr. Friedland, April 19 at 95.

24.   Plaintiff replied that she contacted her husband by telephone, but she could not give SI

Friedland her husband's telephone number. Id.

25.   Plaintiff had in her possession a "marriage register" of the marriage between Plaintiff and

---

[2]At some point during this phase of the investigation, Plaintiff was escorted into the
search room. It is unclear to this Court exactly when that change in location occurred.

Richard Scott. Tr. Friedland, April 19 at 52.

26.   SI Friedland asked Plaintiff how she got her airplane ticket to Jamaica and who paid for her ticket. Tr. Friedland, April 19 at 95; Tr. Denson, April 21 at 152.

27.   After some hesitation, Plaintiff told SI Friedland that a man named Osmond purchased the airplane ticket to Jamaica. Tr. Friedland, April 19 at 95

28.   However, Plaintiff did not know "Osmond's" last name. Id.

29.   Plaintiff further stated that she reimbursed Osmond for the ticket with money from her income tax refund and allegedly showed SI Friedland an H&R Block check stub. Tr. Denson, April 21 at 153.

30.   SI Friedland noted that Plaintiff's ticket was purchased only four (4) days prior to her trip. Tr. Friedland, April 19 at 95.

31.   When SI Friedland questioned Plaintiff about her employment, Plaintiff stated that she worked for Office Depot. Tr. Friedland, April 19 at 98; Tr. Denson, April 21 at 153.

32.   SI Friedland requested the telephone number of Plaintiff's employer. Tr. Friedland, April 18 at 78; Tr. Friedland, April 19 at 98.

33.   When SI Friedland attempted to confirm Plaintiff's employment by calling the number provided by Plaintiff, SI Friedland found that the number had been disconnected. Tr. Friedland, April 18 at 78; Tr. Friedland, April 19 at 98.

34.   SI Friedland asked Plaintiff how much money she was carrying. Tr. Friedland, April 19 at 98.

35.   Plaintiff had in her possession two $100 dollar bills and various other bills. Tr. Friedland, April 19 at 98.

5

36.   Plaintiff traveled with an affidavit of citizenship, rather than a passport or other form of

travel identification.  Pl. Trial. Ex. 42MM; Tr. Denson, April 21 at 145-146.

37.   Plaintiff was carrying a tablet of paper that contained the following handwritten information

about her husband:

RICHARD SCOTT - POULTRY FARMER SINCE 1994


LIVES @     Belfast NEAR MORANT BAY IN THE PARISH OF SAINT
THOMAS.

HIS BIRTHDAY IS:  FEB. 17TH  (BORN 1972)

How you met.

DEC. 1995 A FRIEND INVITED YOU TO JAMAICA WHILE THERE WENT TO
THE BEACH DUNNS RIVER MET HIM THERE.

DEC. 1996 HE VISITED YOU AT YOUR FRIENDS SAINT ANN HOME YOU
INVITED HIM AT HIS SAINT THOMAS HOME
*YOU HAD NO PRIOR KNOWLEDGE OF HIM
YOU RETURNED HOME TO FLORIDA ~ TELEPHONE EXCHANGE

* ALWAYS USED CALLING CARDS ~ PRICE REASONS

MARCH 1996 YOU WENT DOWN TO VISIT HIM IN JAMAICA.

OCT. 1996 YOU WENT BACK TO MARRY HIM

* HIS PHONE WRITTEN DOWN at HOME   809 Something
You are not good with remembering Numbers.

*NOT HIS PHONE ANYWAY Neighbors' Phone.

ANY OTHER Questions Just answer something
in that case try to remember what you were asked and what you answered.

* DOES HE HAVE RELATIVE OR FRIENDS IN U.S. THAT YOU
KNOW OR KNOW OF ------- NO----

6

Pl. Trial Ex. 42BB.

38.   Initially Plaintiff told SI Friedland that she did not know who wrote the document.  Tr. Friedland, April 19 at 37.

39.   Plaintiff later told SI Friedland that she wrote the information on the tablet but that she had seven different handwritings.  Tr. Friedland, April 18 at 97; Tr. Friedland, April 19 at 36-37.

40.   At trial Plaintiff admitted that in fact she did not write the script, but that it was written for her by Osmond.  Tr. Denson, April 21 at 137.

41.   As part of the inspection process, SI Friedland queried the Treasury Enforcement Communication System ("TECS II") computer data base for any information concerning Plaintiff.[3]  Tr. Friedland, April 19 at 101-102.

42.   The TECS lookout stated:

> REFER TO CUSTOMS FOR ENFORCEMENT EXAM.  ACQUIRED TRAVEL DOCUMENTS SHORTLY BEFORE DEPARTURE.  MATCHES HI   RISK NARCO-TARGETING INDICATORS.   (IF ARRIVING FROM SOURCE COUNTRY).

Pl. Trial Ex. 42-CC.

43.   After further questioning by SI Friedland, Plaintiff stated that she was with a friend in Jamaica, but Plaintiff could not provide SI Friedland with this friend's last name.  Tr. Friedland, April 19 at 106.

---

[3] TECS is a computerized system that reveals persons who are entering the country who are on terrorist alert, outstanding warrants, probation violators, persons suspected of narcotics trafficking, money laundering and violations of other laws. Tr. Friedland, April 19 at 102; Tr. Flynn, April 19 at 148.

44.   In addition, Plaintiff stated that she traveled to Jamaica with her friend Shelita Jacobs (phonetic). There is some confusion, however, as to when Plaintiff traveled with Ms. Jacobs, whether it was at this time or during a previous trip to Jamaica. Tr. Friedland, April 18 at 79, 118; Tr. Friedland, April 19 at 106.

45.   However, it appears from the credible evidence that SI Friedland believed that Plaintiff represented to her that Ms. Jacobs was traveling with Plaintiff on this trip. Tr. Friedland, April 18 at 79, 118.

46.   When SI Friedland was unable confirm that in fact Ms. Jacobs had been traveling with Plaintiff, SI Friedland believed that Plaintiff had made a false statement. Tr. Friedland, April 19 at 106.

47.   During the period of questioning at the secondary belt, Plaintiff exhibited signs of nervousness. Plaintiff held tightly to the examination belt to avoid shaking, avoided eye contact, and was breathing heavily. Tr. Friedland, April 18 at 75; Tr. Friedland, April 19 at 93, 97, 141-142.

48.   At this point, on the basis of her experience, SI Friedland concluded that Plaintiff was carrying narcotics internally.

**RESTROOM SEARCH**

49.   Approximately fifteen (15) minutes after SI Friedland completed her questioning of Plaintiff, Plaintiff indicated that she needed to use the restroom. Tr. Friedland, April 19 at 110; Tr. Denson, April 21 at 156.

50.   SI Friedland conducted a pat down of Plaintiff prior to her using the restroom Tr. Denson,

8

April 21 at 157.[4]

51.   SI Friedland testified that she formed the pat down "within the standard operating procedure that [she had] been trained and consistent with the way you are supposed to do it." Tr. Friedland, April 19 at 110. This fact was not controverted at trial. This court thus assumes that this was a routine Terry-like pat down.

52.   The door was left open as Plaintiff used the restroom. Tr. Denson, April 21 at 157.

53.   After Plaintiff used the restroom, consistent with Customs procedures, SI Friedland inspected the toilet paper, the contents of the toilet, and Plaintiff's undergarments. Tr. Friedland, April 18 at. 57-58; Tr. Friedland, April 19 at 110-111; Tr. Banks, April 21 at 88, 96; Tr. Denson, April 21 at 157-159.

54.   Upon returning from the restroom Plaintiff was placed in handcuffs and her property was inventoried. Tr. Denson, April 21 at 160.

55.   SI Friedland then read Plaintiff her rights and asked Plaintiff to sign a waiver which Plaintiff refused to do. Tr. Friedland, April 18 at 80; Tr. Denson, April 21 at 161-162; Pl. Trial Ex. 42AA.

**TRANSPORT TO JACKSON MEMORIAL HOSPITAL ("JMH")**

56.   SI Friedland next sought and received supervisory approval from Acting Port Director Levanka to transport Plaintiff to Jackson Memorial Hospital as a suspected internal narcotics courier. Tr. Friedland, April 19 at 36, 58-60.[5]

---

[4] At some point SI Friedland requested and received permission from Supervisor Flynn to perform the pat down of Plaintiff. Tr. Friedland, April 18 at 57.

[5] Lee Lavenka was appointed by the Port Director to be the Acting Port Director from February 14 through February 16. Tr. Lavenka, April 19 at 190. He had been a supervisory

57.   Approval for examination at Jackson Memorial Hospital was based on the totality of the facts and circumstances gathered by SI Friedland. Tr. Lavenka, April 19 at 192, 204, 206-8; Tr. Levanka, April 20 at 50.

58.   Plaintiff was then transported to Jackson Memorial Hospital for examination and treatment.[6] Tr. Friedland, April 19 at 112; Tr. Fortin, April 21 at 12, 14.

59.   Upon arriving at Jackson Memorial Hospital Plaintiff was photographed and told to go into a room and change from her clothes into hospital clothes. Tr. Denson, April 21 at 163-164.

60.   Plaintiff was then taken to the Labor and Delivery section of the Hospital. Tr. Denson, April 21 at 165-166.

61.   Upon arriving at Labor and Delivery, Plaintiff was asked her name and date of birth by a Jackson Memorial Hospital employee and was asked to sign an unidentified form. Id.

62.   Plaintiff refused to sign this form stating that she was not going to be responsible to pay any bill resulting from her stay. Id.

63.   Plaintiff was next taken into a small waiting room and asked to give a urine sample to verify her pregnancy. Tr. Denson, April 21 at 165-166.

64.   Plaintiff was then placed in a bed which was separated by curtains from other beds. Tr. Denson, April 21 at 166-167.

65.   Plaintiff's left hand was handcuffed to the bed. Id.

_____

customs inspector since 1991. Tr. Lavenka, April 20 at 76.

[6] Customs and Jackson Memorial Hospital have an arrangement whereby the Hospital provides medical services to patients suspected of smuggling contraband inside the body. Tr. Friedland, April 19 at 28.

66. In the presence of SI Friedland, Plaintiff was examined by a physician specializing in obstetrics. Tr. Friedland, April 19 at 31; Tr. Denson, April 21 at 170.

67. The physician performed a pelvic examination and an obstetrical ultrasound examination. Tr. Denson, April 21 at 167-168.

68. The pelvic examination was negative for drugs. Tr. Denson, April 21 at 170-171; Tr. Friedland, April 19 at 32.

69. The obstetrical physical examination and ultrasound, however, did not rule out the possibility that Plaintiff was smuggling drugs in her digestive system. Tr. Levanka, April 19 at 234.

70. Because an x-ray exam during pregnancy is not permitted, Plaintiff was held for a monitored bowel movement. Tr. Friedland, April 19 at 63, 64, 118; Tr. Lavenka, April 20 at 74, 196.

71. This process requires three separate drug-free stool samples in accordance with the standard established by the Jackson Memorial Hospital doctors and United States Customs. Tr. Friedland, April 19 at 27; Tr. Lavenka, April 19 at 196; Tr. Levanka, April 20 at 59.

72. Plaintiff was taken back to Ward D for the monitored bowel movement. Tr. Denson, April 21 at 171.

73. In Ward D Plaintiff was place in a bed and one hand was handcuffed to the bed rail. Tr. Denson, April 21 at 171.

74. Plaintiff was prescribed and provided the laxative Go-Lytely by the hospital staff. Tr. Friedland, April 19 at 26, 29-30, 120.

75. Plaintiff testified that SI Friedland told her that she had to drink the Go-Lytely and pass three clear stools or she was not going to be able to leave. Tr. Denson, April 21 at 175.

76. Plaintiff drank the Go-Lytely and had three bowel movements containing no packets of

11

drugs. Pl. Trial Ex. 42 HH.

77.   The last drug free stool was passed on February 16, 1997 at 9:45 a.m. Pl. Trial Ex. 42 HH.

78.   Following the negative bowel movements, Plaintiff was informed that she was to be released, her handcuffs were removed and she was allowed to dress. Tr. Denson, April 21, at 181.

79.   Plaintiff was discharged on February 16, 1997 after no drugs were found in her digestive system. Tr. Lavenka, April 19 at 202; Tr. Friedland, April 19 at 27.

80.   Plaintiff was driven back to the Ft. Lauderdale airport, where Customs retrieved her property that had been held in a safe, and Plaintiff was allowed to continue on her travel. Tr. Friedland, April 19 at 117, 122; Tr. Denson, April 21 at 182-184.

## CONCLUSIONS OF LAW

**FEDERAL TORT CLAIMS ACT**

1.   This Court has jurisdiction over the parties and the subject matter.  28 U.S.C. § 1346.

2.   In this civil action, Plaintiffs' burden of proof is a preponderance of the evidence.  Sandoval v. Hagan, 7 F. Supp. 2d 1234, 1245 (M.D. Ala. 1998).

3.   "A preponderance of the evidence means such evidence, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved 'is more likely true than not true.'"  Id. (citing Eleventh Circuit Pattern Jury Instructions).

4.   Compared to the summary judgment stage where the court is legally required to view the evidence in the light most favorable to Plaintiffs, and all reasonable inferences to be dawn therefrom, the Court is now required to weigh all the evidence .

5.   Plaintiffs' claims arise under the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680.

12

6.   The FTCA provides that the "United States may be liable for the conduct of its employees 'in the same manner and to the same extent as a private individual under like circumstances.'" Pate v. Oakwood Mobile Homes, 374 F.3d 1081, 1083 (11th Cir. 2004).

7.   Congress's chief intent in drafting the FTCA was not "to create new causes of action" but "simply to provide redress for ordinary torts recognized by state law." Howell v. United States, 932 F.2d 915, 917 (11th Cir. 1991).

8.   It was not "intended as a means to enforce federal statutory duties." Id. Indeed, "even where specific behavior of federal employees is required by statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability." Sellfors v. United States, 697 F.2d 1362, 1367 (11th Cir. 1983).

9.   As a result, in analyzing Plaintiffs' claims, the Court must look to the law of the jurisdiction in which the wrongs are alleged to have occurred, which undisputedly is the state of Florida.

10.   Plaintiff has sued the United States of America in Count Eleven (11) of the Second Amended Complaint, under the Federal Tort Claims Act (FTCA), alleging that a warrantless detention, search, handcuffing, assault, battery and forced medication violated tort law. These claims can be appropriately recast as the torts of assault and battery, false arrest/imprisonment, intentional infliction of emotion distress, and invasion of privacy.

**ASSAULT AND BATTERY**

11.   A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent. Sullivan v. Atlantic Fed. Sav. & Loan Ass'n, 454 So.2d 52, 54 (Fla. Dist. Ct. App. 1984), review denied,

461 So.2d 116 (Fla. 1985); Chorak v. Naughton, 409 So.2d 35, 39 (Fla. Dist. Ct. App. 1981).

12.　"An 'assault' is an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." Sullivan, 454 So. 2d at 54.

13.　Public law enforcement officers acting within the scope of their employment are privileged to use reasonable force to arrest or apprehend criminal suspects. Excessive, unnecessary, or malicious force is not privileged. O'Brien v. Food Fair Stores, North Dade, Inc., 155 So. 2d 836 (Fla. Dist. Ct. App. 1963); City of Miami v. Nelson, 186 So. 2d 535 (Fla. Dist. Ct. App. 1966); Hutchinson v. Lott, 110 So. 2d 442 (Fla. Dist. Ct. App. 1959); Fla. Stat. § 776.05.

14.　"Whether the force used is reasonable is a question of fact to be determined in light of the circumstances of each particular case. In any case the officer can never use more force than reasonably appears to be necessary, or subject the person arrested to unnecessary risk of harm." Miami v. Albro, 120 So. 2d 23, 26 (Fla. Dist. Ct. App. 1960).

## FALSE IMPRISONMENT OR ARREST[7]

15.　The tort of false imprisonment or false arrest is defined as "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty." Johnson v. Weiner, 19 So. 2d 699, 700 (Fla. 1944); Harris v. Lewis State Bank, 436 So. 2d 338 (Fla. Dist. Ct. App. 1983).

16.　The plaintiff need not show that force was used in the detention, nor that she made an oral protest to demonstrate that the detention was against her will. A plaintiff alleging false

---

[7]"It is well established that border searches are not subject to constitutional probable cause and warrant requirements." United States v. McMurray, 747 F.2d 1417, 1419-20 (11th Cir. 1984).

14

imprisonment must show, however, that the restraint was "unreasonable and unwarranted under the circumstances." Harris v. Lewis State Bank, 436 So. 2d 338, 341 (Fla. Dist. Ct. App. 1983) (internal citations omitted).

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

17.    To establish a claim for intentional infliction of emotional distress under Florida law, a plaintiff must show: "(1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) proof that the conduct caused the severe emotional distress." Gonzalez-Jimenez de Ruiz v. United States, 231 F. Supp. 2d 1187, 1199 (M.D. Fl. 2002).

18.    Outrageous conduct has been defined as "outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla. 1985).

19.    "The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances." Id. at 279.

20.    "Conduct is intentional where the actor knows that severe distress is certain, or substantially certain to result from his conduct." Hart v. United States, 894 F.2d 1539, 1548 (11th Cir. 1990).

## UNLAWFUL INVASION OF PRIVACY

21.    Plaintiff alleges an invasion of Plaintiff's right to privacy as defined by Agency for Healthcare Administration v. Associated Industries of Florida, Inc., 678 So. 2d 1239 (Fla. 1996). In that case the court explained that:

15

> The four types of wrongful conduct that can all be remedied with resort to an invasion of privacy action are: (1) appropriation--the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion--physically or electronically intruding into one's private quarters; (3) public disclosure of private facts--the dissemination of truthful private information which a reasonable person would find objectionable; and (4) false light in the public eye--publication of facts which place a person in a false light even though the facts themselves may not be defamatory.

Id. at 1252 n. 20 (citing Forsberg v. Housing Auth. of Miami Beach, 455 So. 2d 373, 376 (Fla. 1984)).

22.    It appears that Plaintiff is relying on the second element of invasion of privacy -- intrusion-- as the legal basis for her invasion of privacy claim. That element, however, makes actionable unwelcome entry into "one's private quarters."

23.    As the Florida Supreme Court clarified in Allstate Ins. Co. v. Ginsberg, 863 So. 2d 156 (Fla. 2003), "[t]he intrusion to which this refers is into a "place" in which there is a reasonable expectation of privacy and is not referring to a body part. The tort of invasion of privacy was not intended to be duplicative of some other tort." Id. at 162.

24.    Plaintiff's claim for invasion of privacy under Florida state law must therefore fail as a matter of law.

**BORDER SEARCHES**

25.    In looking at whether Defendant, the United States of America, committed each of the remaining torts --assault and battery, false imprisonment/arrest and intentional infliction of emotional distress -- this Court must consider the reasonable suspicion of the Customs officers.

26.    In the context of border searches, the law that is binding upon this Court is very well settled. Customs and Immigration checkpoints in our Nation's airports are the functional equivalent

16

of national borders, and as such, United States Customs officials can conduct routine searches upon all individuals as a matter of constitutional right. See Almeida-Sanchez v. United States, 413 U.S. 266, 272 (1973); United States v. Hewitt, 724 F.2d 117 (11th Cir. 1984).

27.   Routine border searches, which include searches of luggage and Terry-style pat down searches, are presumed to be reasonable. United States v. Ramsey, 431 U.S. 606, 616 (1977); United States v. Vega-Barvo, 729 F.2d 1341, 1344 (11th Cir. 1984) (holding that "[n]o articulable suspicion is required for routine border searches which only intrude slightly on a person's privacy. Both a luggage search and a pat-down or frisk fall within this category and these searches can legitimately be carried out on no more than a generalized "mere suspicion" or "subjective response" of the customs inspector") (internal citations omitted); Brent v. Ashley, 257 F.3d 1294 (11th Cir. 2001) (holding that no level of suspicion is necessary for the stop of an entrant, for questioning of the individual, for examination of the entrant's possessions, or for a pat-down of the outer garments).

28.   The Supreme Court explained the reasoning behind this policy in Montoya De Hernandez:

> Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.

United States v. Montoya De Hernandez, 473 U.S. 531, 537 (1985).

## THE INITIAL STOP AND PAT DOWN

29.   An initial stop, search of luggage and pat down search, are presumed to be reasonable at the border. United States v. Ramsey, 431 U.S. 606, 616 (1977); United States v. Vega-Barvo, 729 F.2d 1341, 1344-5 (11th Cir. 1984).

17

30.  Here, the record reveals that Plaintiff was subjected to a pat down behind closed doors. The uncontroverted evidence demonstrates that during this pat down, the Customs official manually inspected Plaintiff's entire body above her clothing.

31.  This portion of Plaintiff's experience did not exceed the threshold of routine Customs procedure and as such, was well within the bounds of the law. This Court finds that the stopping of Plaintiff, the search of her luggage and the pat down were per se reasonable.

## THE RESTROOM SEARCH AND TRANSPORT
## TO JACKSON MEMORIAL HOSPITAL

32.  The Supreme Court in Montoya noted that internal smuggling of drugs gives an inspector no external clues that this is the method of concealment. The Court held that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." Montoya, 473 U.S. at 541.

33.  Searches that are not routine must be based on reasonable suspicion. The reasonable suspicion standard requires a showing of articulable facts which are particularized as to the person and as to the place that is to be searched. Vega-Barvo, 729 F.2d 1341 (11th Cir. 1984).

34.  "Once reasonable suspicion exists to detain a traveler, the detention can continue "for the period of time necessary to either verify or dispel the suspicion." Montoya, 473 U.S. at 544

35.  The Court is mindful that the conduct of a traveler might be innocently explained, but to an experienced inspector may be suspicious. United States v. Arvizu, 534 U.S. 266 (2002) (a unanimous Court concluded that odd conduct when entering the country cannot be discounted,

18

merely because an innocent explanation can be offered for the conduct); Vega-Barvo, 729 F.2d at 1350 ("Many of the factors supporting reasonable suspicion will seem innocent enough if evaluated independently and without the expertise of an experienced customs inspector").

36. The Supreme Court has cautioned against indulging in "unrealistic second guessing," and that those "engaged in post-hoc evaluations of [police] conduct can almost always imagine some alternative means by which the objectives of the [police] might have been accomplished." United States v. Sharp, 470 U.S. 675, 686 (1985).

37. In this instance, Plaintiff, in the midst of an enforcement exam, requested to use the restroom. SI Friedland, accompanied by Inspector Banks, escorted Plaintiff to the restroom.

38. The door was left open as Plaintiff used the restroom. Tr. Denson, April 21 at 157.

39. After Plaintiff used the restroom, SI Friedland inspected the toilet paper, the contents of the toilet, and Plaintiff's undergarments. Tr. Friedland, April 18, p. 57-58, April 19, p. 110-111; Tr. Banks, April 21 at 88, 96; Tr. Denson, April 21 at 157-159.

40. SI Friedland's primary purpose in conducting this inspection was ensuring that Plaintiff was not disposing of narcotics or destroying evidence. This inspection was ancillary to Plaintiff's request to urinate.

41. SI Friedland testified that she went into the bathroom with Plaintiff because it was Customs policy that two female officers must accompany a female that requests to use the bathroom during an enforcement exam. Tr. Friedland, April 18 at 57.

42. Further, she testified that, as was required by Customs, she watched Plaintiff urinate, looked at her undergarments, panty liner, toilet bowl and used tissue. Id. at 57-58; Tr. Friedland, April 19 at 110-111.

19

43. SI Friedland testified that it was not her intent to take Plaintiff to the ladies room or to search Plaintiff absent Plaintiff's request to use the restroom. Friedland, April 19 at 110.

44. Customs officers were aware that internal narcotics couriers frequently try to dispose of narcotics in the restroom. Tr. Friedland, April 19 at 111.

45. Moreover, the credible evidence presented in this case demonstrates that the Customs officers did not search Plaintiff's body in a manner consistent with a typical strip search. Rather the Customs officers' restroom examination of Plaintiff was limited to inspecting the above mentioned items.

46. Second, this Court notes that the intrusiveness of this non-routine border search was minimal. The intrusiveness of a search is measured by the indignity suffered by the person searched. Vega-Barvo, 729 F.2d at 1345.

47. In United States v. Vega-Barvo, 729 F.2d 1341, 1344 (11th Cir. 1984) the court held that as the intrusiveness of the search increases, the amount of suspicion necessary to justify the search correspondingly increases. Id. Thus, the personal indignity suffered by the individual searched controls the level of suspicion required to make the search reasonable. Id. at 1346.

48. The Court in Vega-Barvo isolated three factors that contribute to the indignity of the person searched: (1) personal contact between the searcher and the person searched; (2) exposure of intimate body parts; and (3) use of force. Id. at 1346.

49. There was simply no testimony at trial of any physical contact between Plaintiff and SI Friedland during the restroom search. Moreover, any exposure of intimate body parts was minimal. Furthermore, there was no threat of force or use of force.

50. As such, upon close examination of the credible evidence and testimony presented at trial and

20

applying the Vega-Barvo factors to assess the indignity suffered by Plaintiff during the restroom encounter, the Court determines that the intrusiveness of this search and the indignity suffered by Plaintiff was minimal.

51. The Customs officers had overwhelming reasonable suspicion to suspect that Plaintiff was an internal narcotics courier and a credible basis for believing that she was requesting to use the restroom to dispose of narcotics.

52. Upon reasonable suspicion, persons suspected of being "internal drug couriers," "swallowers" or "mules" may be detained and taken to a hospital for either an x-ray or confined for excretion of the stomach contents. United States v. De Montoya, 729 F.2d 1369, 1371 (11th Cir. 1984); United States v. Padilla, 729 F.2d 1367 (11th Cir. 1984).

53. "Once a particularized suspicion arises that you are an internal carrier, the agents can conduct a search sufficient to determine the accuracy of that suspicion, the type of search depending in part on what you consent to. In the absence of consent, the agents can detain you until nature reveals the truth or falsity of their suspicions." United States v. Pino, 729 F.2d at 1360.

54. "Once the Customs officers developed reasonable suspicion that [Plaintiff] was an internal carrier, they could permit nature to run its course or ask [Plaintiff] to speed up the process by taking the laxative." United States v. Saldarriaga-Marin, 734 F.2d 1425 (11th Cir. 1984).[8]

55. In Vega-Barvo the court adopted a "flexible test which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search." 729 F.2d at 1344.

---

[8]This Court notes that handcuffing someone who is a suspected internal narcotics carrier is reasonable. United States v. Henao-Castano, 729 F.2d 1364, 1366 (11th Cir. 1984) (finding that "[s]hackling [Plaintiff] to a wheelchair was a reasonable method of preventing him from attempting to dispose of the contents of his stomach before they could be searched").

56.     In this case SI Friedland was presented a plethora of extremely unusual and troubling facts that combined to form her reasonable suspicion that Plaintiff was an internal narcotics courier.

57.     Plaintiff was a pregnant female who arrived in Ft. Lauderdale from Jamaica, a source country, after an extremely brief stay. Customs inspectors are aware that short trips are common by smugglers, because the cost of the trip is minimized and the payoff increased. Tr. Friedland, April 18 at 61; Tr. Friedland, April 19 at 96-97.

58.     Plaintiff was traveling with no luggage and carried only a purse and handbag. Inspectors were aware that lack of luggage is common for internal narcotics carriers because it minimizes the amount of time that they must remain in the Customs area. Tr. Friedland, April 18 at 70; Tr. Levanka, April 19 at 229.

59.     Plaintiff could not provide any specifics about the person who, only four days prior to travel, had purchased Plaintiff's airplane ticket. Inspectors testified that a "third-party booking" of a ticket is significant in the context of internal narcotics couriers, particularly when the passenger does not know the name of the purchaser. Third-party booking is a method that smugglers use to avoid revealing the identity of one or more of the smugglers. Tr. Friedland, April 18 at 69; Tr. Friedland, April 19 at 96; Tr. Smith, April 20 at 143; Tr. Fortin, April 21 at 19.

60.     Plaintiff had taken multiple short trips to Jamaica in 1996. Tr. Denson, April 21 at 189.

61.     Plaintiff stated that she went to Jamaica to visit her husband but she was unable to provide an address or telephone number for her husband. Supra at ¶¶ 15-18.

62.     Plaintiff could not present verifiable employment information. Lack of verifiable employment is a factor that inspectors consider in assessing the possibility of narcotics smuggling. Tr.

22

Friedland, April 18 at 78, April 19 at 98. Furthermore, the phone number for her employer that Plaintiff provided to SI Friedland was out of service. Supra at ¶¶ 23-25.

63.    To further heighten the Customs officers' suspicion, Plaintiff was flagged as a potential drug courier in the TECS II computer system. Tr. Friedland, April 18 at 125-6, April 19 at 45, 101-102. A TECS II entry is significant to inspectors in assessing whether the person entering the United States is importing illegal drugs. Tr. Smith, April 20 at 131.

64.    At trial there was extensive testimony regarding the significance of the "start and stop date" indicated on the TECS query. The TECS II query contained the following information: "START 110196 " and "STOP 013097." Various parties testified as to the existence of both a thirty (30) day "lookout" and one (1) year "lookout" that can be inputted into the TECS system.

65.    This Court first notes that the "lookout" at issue here is in fact a 90 day lookout. This Court further notes that the ninety (90) day lookout, which would have triggered an immediate referral by primary customs to secondary customs between the dates of 11/01/96 and 1/30/96, expired as a primary lookout only two (2) weeks before the incident at issue in this case.

66.    Plaintiff's counsel made much of the fact that since the primary lookout dates had expired, SI Freidland had to query the TECS II system in order to obtain this TECS II report. This Court rejects any inference that a Customs inspector's query of the TECS II system at the secondary belt amounts to any sort of extraordinary investigatory measure. Tr. Friedland, April 18 at 126.

67.    All that is necessary to pull up this information is the passenger's name and date of birth. Tr. Friedland April 19 at 103.

68.    Furthermore, this Court notes that the credible evidence demonstrates that while the primary

23

lookout trigger date expired on 1/30/97, the TECS II report would remain in the system for any inspector to consult for at least one year. Tr. Friedland, April 18 at 94.

69.   After the year expired a notification would be sent to the creator of the report notifying the creator of the impending expiration of the report and the creator could then choose whether to let the report expire or allow it to remain in the system. Tr. Smith, April 20 at 138.

70.   In addition to all of these suspicious circumstances, there was the extraordinarily peculiar script that Plaintiff was carrying. The script appeared to be a cover story written for Plaintiff by a third party. Tr. Friedland, April 19 at 36.

71.   Each of the Customs inspectors who testified at trial agreed that the script was a "red flag," "highly suspicious," and indicative of someone entering the United States with illegal drugs. Tr. Lavenka, April 20, at 67-68; Tr. Smith, April 20 at 130-131, 137; Tr. Cappuccio, April 21 at 36; Tr. Fortin, April 21 at 17-18, 22-24.

72.   Consider the script in context: Plaintiff told SI Friedland that she was in Jamaica to visit her husband; Plaintiff could not answer SI Friedland's routine questions about her husband; many answers to SI Friedland's questions were provided on the script. Tr. Friedland, April 19 at 39, 101.

73.   At trial Plaintiff testified that at the time of her detention she was carrying immigration documents for Richard Scott's immigration to the United States. Plaintiff testified that the script was tailored to the interview that she and her husband, Richard Scott, were going to have with immigration officials. Tr. Denson, April 21 at 144.

74.   SI Friedland testified, however, that Plaintiff did not show her these immigration documents. Tr. Friedland, April 18 at 74; Tr. Friedland, April 19 at 40.

24

75. Plaintiff also testified that she was carrying photographs from her wedding to Richard Scott for their interview with immigration officials. Tr. Denson, April 21 at 152, 154; Pl. Trial Ex. 59-B-G.

76. No matter what the true purpose of this script may have been, whether to hoodwink immigration officials or to hoodwink Customs officials, the fact remains that SI Friedland, was confronted with this highly unusual document in conjunction with other suspicious indicators.

77. Plaintiff was traveling with an Affidavit of Citizenship in lieu of a passport. This affidavit of citizenship is a travel document that experienced inspectors had not previously seen and did not know that one could travel with to Jamaica. Tr. Friedland, April 18 at 123; Tr. Friedland, April 19 at 47; Tr. Flynn, April 19 at 149-150; Tr. Lavenka, April 19 at 214, Tr. Smith, April 20 at 139-140.

78. Plaintiff exhibited many indications of nervousness that inspectors are trained to look for, including heavy breathing and avoiding eye contact. Tr. Smith, April 20 at 133; Tr. Cappuccio, April 21 at 34.

79. "When used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person . . . ." United States v. Cortez, 449 U.S. 411, 419 (1981); see Vega-Barvo, 729 F.2d at 1350 (quoting Cortez).

80. Moreover, the credible evidence reveals that the facts presented to SI Friedland provide precisely the sort of suspicious circumstances the Court of Appeals found lacking in Brent v. Ashley, 257 F.3d 1294 (11th Cir. 2001).

81. In Brent, the Court of Appeals held that the officers did not have reasonable suspicion based

25

on the plaintiff's nervousness and her travel from a known drug source city because, among other things, "Brent presented verifiable residence and employment information" and "a check of Brent's name in the Treasury Enforcement Computer System revealed nothing suspicious." 247 F.3d at 1301.

82.   The facts presented to the Customs officials in this case, considered in the totality, provide a sufficient basis upon which Customs officials could reasonably have suspected Plaintiff of internal narcotics smuggling.

83.   "As a search progresses from a stop, to a pat-down search, to a strip search, an agent must reevaluate whether reasonable suspicion to justify the next level of intrusion exists in light of the information gained during the encounter." Brent, 247 F.3d at 1300 (citing Vega-Barvo, 729 F.2d at 1349).

84.   The Customs officers' actions, from the pat down to transport to Jackson Memorial Hospital, were reasonable in light of the overwhelming evidence that provided the officers with reasonable suspicion that Plaintiff was an internal narcotics carrier.

85.   These circumstances convinced Customs inspectors with years of experience and knowledge of the circumstances under which internal carriers attempt entry into the United States, that Plaintiff was indeed an internal carrier.[9]

---

[9]This Court is mindful of the plethora of cases in which the Eleventh Circuit Court of Appeals has assessed a variety of reasonable suspicion determinations in criminal cases in which defendants have sought to suppress evidence of their internal smuggling. The facts of those cases are no more extensive in finding reasonable suspicion than the facts in this case. In United States v. Saldarriaga-Marin, 734 F.2d 1425 (11th Cir. 1984), Marin was wearing a party dress which inspectors though unusual for travel attire, the ticket had similarities to another traveler in custody, she was nervous, and the passenger stated that she was going to visit a relative, but could not give the address or telephone number for the relative. The court held that those factors constituted reasonable suspicion to conduct an x-ray exam. The x-ray of passenger Marin was

86.    Customs officials are entitled to broad discretion to search persons entering the United States
       to prevent the importation of contraband.

87.    As described by the Supreme Court, alimentary canal smuggling of narcotics is a frequently
       utilized method that is very difficult to detect. Montoya, 473 U.S. at 539.

88.    To counter this deceptive importation method, a Customs inspector is entitled to make a
       "common sense" assessment of a person's behavior taking into account various circumstances
       that may suggest a need for further investigation. Montoya, 473 U.S. at 542.

89.    From the perspective of an officer at the border who routinely engages the traveling public and
       has experience in the interdiction of narcotics that are being brought into this country illegally,

---

inconclusive. A laxative was given to the traveler to induce a bowel movement, which the court
upheld.  In United States v. Mosquera-Ramirez, 729 F.2d 1352 (11th Cir. 1984), the court held
that a person who refuses an x-ray search may be detained until a bowel movement occurs
through natural body functions. In that case, the court upheld holding the traveler for a
monitored bowel movement based on inconsistent answers which led to a more thorough search,
where the defendant became more nervous and evasive. In United States v. Pino, 729 F.2d 1357,
1359 (11th Cir. 1984), the court upheld a rectal exam of the traveler, finding it justified by travel
from a source county, inconsistent clothing for the travel purpose, cash ticket purchased by
another, and evasive answers provided in a nervous manner. In United States v. Vega-Barvo,
729 F.2d 1341, 1344 (11th Cir. 1984), the court held that reasonable suspicion exists for a search,
even where it is based substantially on the inability to give a credible explanation for a trip to the
United States, traveling alone, nervous, with only one piece of luggage, and a ticket purchased by
another. "Since swallowers follow a different mode of operation, customs agents' suspicions will
be aroused by different factors. For example ... the traveler's inability to explain his or her trip. .
. ." Vega-Bravo, 729 F.2d at 1350.   Moreover the facts assessed by the Supreme Court in
United States v. Montoya de Hernandez, 473 U.S. 531 (1985), were far less suspicious than those
presented to the Customs officials in this case. In Montoya, suspicions were aroused by the
number of trips the traveler had taken, her arrival from a source city, suspicious answers given to
questions, and possessions inconsistent with the purpose of the trip. Plaintiff was wearing two
pairs of elastic underpants with a paper towel lining, had not taken food or drink, resisted the
calls of nature, and had a rigid and firm stomach.

27

officers presented with this type of evidence would have been remiss in their duties had they not followed through.

90. Accordingly, this Court holds as a matter of law, that Customs officials had reasonable suspicion to justify each non-routine search of Plaintiff.

91. Because this Court determines that the United States Customs officials acted with reasonable suspicion and that their actions were reasonable, Plaintiff's claims under the Federal Tort Claims Act must necessarily fail.

92. With respect to Plaintiff's claims for assault and battery, the Court finds that any use of force was objectively reasonable and privileged under the circumstances.

93. With respect to Plaintiff's claim for false imprisonment or false arrest, Plaintiff must show that the restraint was "unreasonable and unwarranted under the circumstances." Harris v. Lewis State Bank, 436 So. 2d 338, 341 (Fla. Dist. Ct. App. 1983)(internal citations omitted).

94. Because this Court finds that the actions of the United States Customs officials were reasonable and based on reasonable suspicion, Plaintiff's claim for false imprisonment/arrest necessarily must fail.

95. With respect to Plaintiff's claim for intentional infliction of emotional distress, based on the Court's conclusions that the Customs officers had reasonable suspicion to conduct the non-routine border searches of Plaintiff and that the Customs officers did not use excessive force or assault or batter Plaintiff, the Court finds that Plaintiff has failed to establish by a preponderance of the credible evidence that the Customs officers engaged in extreme or

28

outrageous conduct. [10, 11]

## CONCLUSION

Accordingly, based on the foregoing it is

ORDERED AND ADJUDGED that Judgment is entered for Defendant United States of America on Count XI, the FTCA claims of the Second Amended Complaint. Defendant shall move for final judgment within ten (10) days from the date of this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this _5th_ day of August, 2005.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

---

[10]Based on the Court's conclusion that the Plaintiffs have failed to show that the Customs officers engaged in any extreme and outrageous conduct, the Court need not address Plaintiffs' evidence with respect to the other elements of a claim for intentional infliction of emotional distress.

[11]Because Plaintiff Taylor Jordan's claims are derivative of Janneral Denson's claim, his claims under the FTCA must necessarily fail.

29