# United States Court of Appeals

Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

October 14, 2009



Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1813

**Appeal Number: 05-15572-CC**
Case Style: Janneral Denson v. USA
District Court Number:  98-07256 CV-KMM

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
    Original Exhibits, consisting of: eight folders, one box
    Original record on appeal or review, consisting of: fifteen volumes

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 05-15572

District Court Docket No.
98-07256-CV-KMM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jul 15, 2009

THOMAS K. KAHN
CLERK

JANNERAL DENSON,
JORDAN L. TAYLOR, a minor, Janneral Denson, Guardian,

                Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,
JOHN & JANE DOES, certain unnamed United States Customs Agents,
individually and in their official capacities as United States Customs Agents,
PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY,
d.b.a. Jackson Memorial Hospital,
IRA CLARK, individually and as President/Director of Jackson Memorial Hospital,
JOHN & JANE DOES, DRS., certain unnamed Doctors and Nurses employed by Jackson
Memorial Hospital, individually and in their official capacities as Doctors and Nurses employed
by Jackson Memorial Hospital, et al.,

                Defendants-Appellees.

A True Copy   Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

-----------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
-----------------------------------------------------------------

## JUDGMENT

    It is hereby ordered, adjudged, and decreed that the attached opinion included herein by
reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
OCT 1 4 2009
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:    July 15, 2009
For the Court:    Thomas K. Kahn, Clerk
By:    Patch, Jeffrey

CORRECTED

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| JULY 15, 2009 |
| THOMAS K. KAHN |
| CLERK |

No. 05-15572

D. C. Docket No. 98-07256-CV-KMM

JANNERAL DENSON,
JORDAN L. TAYLOR, a minor, Janneral Denson,
Guardian,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,
JOHN & JANE DOES, certain unnamed United States
Customs Agents,
individually and in their official capacities as
United States Customs Agents,
PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY,
d.b.a. Jackson Memorial Hospital,
IRA CLARK, individually and as President/Director
of Jackson Memorial Hospital,
JOHN & JANE DOES, DRS., certain unnamed Doctors
and Nurses employed by Jackson Memorial Hospital,
individually and in their official capacities as
Doctors and Nurses employed by Jackson Memorial
Hospital, et al.,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Florida

---

(July 15, 2009)

Before TJOFLAT, CARNES and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

This case arose when Janneral Denson and Jordan L. Taylor sued the U.S.

Customs Service, Customs Inspectors Cheryl Friedland and Lee Lavenka, and

several members of the Jackson Memorial Hospital medical staff under Bivens v.

Six Unknown Named Agents, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619

(1971), and the Federal Tort Claims Act.[1]  Denson claimed that the Customs

inspectors violated her rights under the U.S. Constitution and Florida tort law by

searching her at the Fort Lauderdale International Airport after she arrived aboard a

flight from Jamaica on the purported  suspicion that she was attempting to smuggle

---

[1] See Federal Tort Claims Act (FTCA), Pub. L. No. 79-601, §§ 401–424, 60 Stat. 812, 842 (1946) (codified as amended in scattered sections of 28 U.S.C.). Bivens and FTCA claims are brought against separate defendants. Bivens claims are brought against federal employees in their individual capacities; FTCA claims are brought against the United States. In this matter, the plaintiffs combined the claims in a single complaint. For ease of discussion, we refer to the Bivens and FTCA claims as separate cases.

2

narcotics into the United States inside her alimentary canal.[2]  She also claimed that the inspectors and the hospital's medical staff violated the same rights by utilizing certain invasive procedures at the hospital in an effort to determine whether she was carrying drugs internally.  The United States District Court for the Southern District of Florida entered judgment in favor of the defendants in both actions, and Denson and Taylor appeal.  We affirm.

## I.

### A.

South Florida is a notorious entry point for narcotics smugglers from source countries, such as Jamaica.  To maximize its ability to detect these smugglers, the U.S. Customs Service employs a dyadic checkpoint configuration at South Florida airports.  This system requires each deplaning passenger to first pass through a primary checkpoint, located just past the baggage carousel, where inspectors perform inspections of passenger documents and ask routine questions concerning the purpose of the passenger's trip.  If nothing appears out of the ordinary, the inspector clears the passenger for entry into the United States.  On the opposite end of the room, between the primary checkpoint and the main terminal, Customs

---

[2]  The alimentary canal is also known as the gastrointestinal tract or the digestive tract. After an external examination of Denson's body failed to reveal any contraband, the hospital staff gave Denson a laxative to discover whether she was carrying drugs internally.  They discovered that she was not.

3

inspectors operate a secondary Customs station to scan the entire concourse and note any unusual or suspicious activities or behaviors that might warrant further investigation.  For instance, Customs trains its inspectors to mind when a passenger is traveling without checked baggage because internal narcotics couriers commonly travel without luggage to minimize the amount of time they have to remain in Customs.

At 6:00 p.m. on Wednesday, February 12, 1997, Janneral Denson, a six-months' pregnant American citizen residing in Boynton Beach, Florida, traveled on Air Jamaica flight 36 from Miami, Florida to Kingston, Jamaica.  The nonstop flight lasted one hour and forty minutes and landed at 7:40 p.m.  Less than two days later, on the afternoon of February 14, 1997, Denson returned to the United States via Air Jamaica flight 89, arriving at the Fort Lauderdale International Airport around 3:30 p.m.  Denson had originally been scheduled to arrive at the Miami International Airport at 1:25 p.m., but Air Jamaica canceled her original flight and rerouted her to Fort Lauderdale, where it planned to provide her ground transportation to her car in Miami.

Because of its point of departure, Customs inspectors in Fort Lauderdale were on high alert when Air Jamaica flight 89 arrived.  Consistent with Customs procedures and directives, after deplaning and clearing immigration, Denson

4

provided her declaration form to a Customs inspector stationed at the airport's primary checkpoint and answered several standard questions about her trip. Satisfied with Denson's responses, the inspector cleared her for entry into the United States. From the vantage point of the secondary inspection area, Senior Customs Inspector Cheryl Friedland noticed Denson, a single traveler carrying no checked luggage, quickly exiting the Customs area and avoiding her eye contact. Her suspicions peaked, Friedland hurriedly walked toward Denson and called out to her. Though Denson stood no more than five feet away from Friedland, she did not respond and appeared to ignore Friedland's efforts to stop her. After catching up with Denson, Friedland escorted her to the secondary Customs station for questioning.[3]

Once at the examination area, the obviously pregnant Denson had trouble answering Friedland's routine questions and exhibited signs of nervousness—Denson held tightly to the x-ray machine to avoid shaking,[4] avoided eye contact, was breathing heavily, and sweating profusely. Based on her training and experience, Friedland identified Denson's behaviors and general demeanor as indications that Denson was attempting to hide contraband. Friedland also took

---

[3] The secondary station area consisted of a computer terminal and an x-ray machine for examining luggage and other items.

[4] Denson was holding onto the belt that fed items into the machine.

5

into account the infamous fact that drug dealers frequently recruit pregnant women as internal drug couriers ("mules") because x-ray examinations may not be performed on a pregnant woman for fear of harming the unborn child.

Friedland began interviewing Denson by asking her about the purpose of her trip to Jamaica. Denson responded that she had flown to Jamaica to visit her husband, Richard Scott, but she was initially unable to recall where he lived. After pausing for a few moments, Denson simply stated that her husband lived in a parish in Jamaica. Friedland next asked Denson how she contacted her husband. Denson replied that she contacted him by telephone, but she could not remember his phone number. Friedland next examined Denson's tickets and took note that they had been purchased only four days prior to Denson's departure and that the duration of her trip to Jamaica was extremely brief, approximately one and a half days. Friedland considered this factor significant because internal narcotics smugglers often take short trips to limit expenses and increase the overall profitability of their trip.

Friedland then asked Denson how she acquired her plane ticket and who paid for it; she replied that she did not know. When asked again, Denson, after some hesitation, stated that a man named Osmond purchased her ticket, but she did not know his last name. When asked about her employment, Denson said that she

6

worked for Office Depot. She then gave Friedland a telephone number that she claimed was her work number. Friedland called only to discover that the number had been disconnected. These responses significantly heightened Friedland's suspicions that Denson was attempting to smuggle drugs into the United States. Among other things, third-party booking, like that provided for Denson, is a familiar method smugglers employ to avoid revealing their identity; additionally, Customs trains its inspectors to take note when persons provide unverifiable employment information, as narcotics smugglers are often unable to provide such specific information.

Friedland proceeded to search through Denson's belongings—a manila folder, a purse, and a small carry-on bag. Of note, Denson had in her possession two new $100 bills and six $1 bills,[5] a marriage register of the marriage between herself and Scott, an affidavit of citizenship in lieu of a passport,[6] and a tablet of paper containing the following hand-written information about her husband that

---

[5] Customs inspectors know that drug smugglers often travel with one-hundred dollar bills.

[6] At this time, United States citizens were permitted to travel to Jamaica with an affidavit of citizenship. Denson obtained her affidavit from a notary employed by Skycaps International at the Miami International Airport. Friedland had not previously encountered this type of travel document.

appeared to be a cover story written for Denson by a third party:[7]

> Richard Scott – Poultry Farmer Since 1994
>
> Lives @ Belfast Near Morant Bay in the Parish of Saint Thomas
>
> His birthday is: Feb. 17th (Born 1972)
>
> <u>How you met.</u>
>
> Dec. 1995 A friend invited you to Jamaica while there went to the
>
> beach Dunns River met him there
>
> Dec. 1996 He visited you at your friends Saint Anne home you invited
>
> him at his Saint Thomas home
>
> *You had no prior knowledge of him
>
> You returned home to Florida – Telephone Exchange
>
> *Always used calling cards – Price Reasons
>
> March 1996 You went down to visit him in Jamaica.
>
> Oct. 1996 You went back to marry him
>
> *His phone number written down at home 809 something
>
> You are not good with remembering numbers.

---

[7] Denson testified at trial that she was also carrying immigration application documents for Scott and pictures of her wedding and that she informed Friedland that the purpose of her visit was to meet with Jamaican immigration officials. Friedland disputed these assertions. We additionally note that the immigration documents plaintiff introduced at trial were issued by the United States government and were to be filed with the U.S. Immigration and Naturalization Service, not Jamaican authorities.

\*NOT HIS PHONE ANYWAY Neighbors' Phone.

ANY OTHER Questions Just answer something

in that case try to remember what you were asked and what you

answered.

\*DOES HE HAVE RELATIVES OR FRIENDS IN THE U.S. THAT

YOU KNOW OF ---**NO**---

When asked who wrote the document, Denson said that she did not know.[8]

As part of the inspection process, Friedland queried the Treasury

Enforcement Communications System (TECS)[9] computer data base for any

information concerning Denson.  The query returned a TECS alert stating the

following:

REFER TO CUSTOMS FOR ENFORCEMENT EXAM.

ACQUIRED TRAVEL DOCUMENTS SHORTLY BEFORE

DEPARTURE.  MATCHES HI RISK NARCO-TARGETING

---

[8] Friedland immediately asked Denson to write down the answers to her questions on her tablet of paper so that Friedland could compare the handwritings.  The handwriting samples did not match.  At the hospital the next evening, Denson informed Friedland that she had in fact written the document and that it appeared to be written by someone else because she had seven different handwritings.  At trial, Denson said that she did not write the script but that Osmond wrote it for her.

[9] TECS is a computerized system that displays if a person entering the United States is on terrorist alert, suspected of narcotics trafficking or money laundering, a probation violator, has any outstanding warrants, or is in violation of other laws.

INDICATORS. (IF ARRIVING FROM A SOURCE COUNTRY).

Customs Inspector Katherine Romanac entered the TECS alert at the Miami International Airport on November 1, 1996. For a ninety-day period thereafter, inspectors would automatically refer Denson to a secondary inspection station were she to arrive in the United States from a source county. Though the original ninety-day lookout for Denson expired on January 30, 1997, the TECS report remained in the system for one year and continued to have significance in assessing whether Denson was smuggling drugs into the United States.

After further questioning, Denson told Friedland that she had traveled to Jamaica with a friend, Shelita Jacobs. Denson also stated that she had visited with another friend, Coreen, in Jamaica, but could not recall her last name. Friedland was unable to confirm in the computer database that Jacobs had been traveling with Denson. At this point, based on her twenty-one years of experience as a Customs inspector, Friedland concluded that Denson was likely carrying narcotics inside her body.

Approximately fifteen minutes after Friedland completed her questioning, Denson requested to use the restroom. Friedland consented, but because she was aware that narcotics couriers frequently try to dispose of narcotics in the restroom,

10

Friedland, with supervisory approval, conducted a routine <u>Terry</u>[10] pat down.

Friedland and Customs inspector Linda Banks then escorted Denson to the

restroom, leaving the stall door open while Denson urinated. Afterwards,

consistent with Customs procedures, Friedland inspected the toilet paper, contents

of the toilet, and Denson's undergarments to ensure that she was not disposing of

narcotics or other evidence. After they returned from the restroom, Friedland

placed Denson in handcuffs and inventoried her property. Friedland read Denson

her <u>Miranda</u>[11] rights and asked her to sign a waiver, which she refused to do.

Friedland then received supervisory approval from then Acting Port Director Lee

Lavenka[12] to transport Denson to Jackson Memorial Hospital[13] as a suspected

internal narcotics courier. Lavenka based her decision on the totality of the facts

---

[10] <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 30–31, 88 S. Ct. 1868, 1880–84, 20 L. Ed. 2d 889 (1968) (holding that an officer may stop an individual and conduct a limited search if the officer forms a reasonable suspicion that the individual is engaging in, has engaged in, or is about to engage in illegal activity). Friedland conducted the pat down in the Customs secondary station search room in the presence of Customs Inspector Linda Banks.

[11] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966) (holding that statements made by a suspect in police custody are admissible at trial only if an officer has informed the suspect of his right to counsel and his right against self-incrimination and the suspect knowingly waived those rights).

[12] Levenka was a Supervisory Customs Inspector acting as Port Director in the Director's temporary absence.

[13] The U.S. Customs Service and Jackson Memorial Hospital had a standing arrangement whereby the hospital provided medical services to patients whom Customs suspected of smuggling contraband internally. Several inspectors also staffed an office Customs maintained at the hospital.

and circumstances as gathered and reported by Friedland.  Shortly thereafter, Customs inspector Selwyn Smith drove Friedland, Banks, and Denson to Jackson Memorial Hospital in Miami, located approximately twenty miles away from the Fort Lauderdale airport.

After arriving at the hospital's custody ward ("Ward D"), intake staff photographed Denson and had her change into hospital clothes.  Friedland, Smith, and a hospital technician then escorted Denson to the maternity ward for an examination.  At the registration desk, Denson refused to sign a treatment consent form, stating that she would not be responsible for paying any bill resulting from her stay.  After Denson provided a urine sample to confirm her pregnancy, the hospital staff placed her in a hospital bed and Friedland handcuffed her to the bed rail.

With Friedland present, an obstetrician examined Denson by performing a pelvic examination and an obstetrical ultrasound.  Though the examinations were negative for drugs, they did not rule out the possibility that Denson was smuggling drugs in her alimentary canal.[14]  Because physicians cannot perform x-ray examinations during pregnancy, Friedland and Smith returned Denson to Ward D

---

[14] Friedland informed Lavenka of the negative pelvic exam and Lavenka authorized Denson's continued detention for monitored bowel movements.

for monitored bowel movements.[15]

Under the standard protocol Jackson Memorial Hospital established in conjunction with the U.S. Customs Service, Denson was required to pass three separate drug-free stool samples. To help induce the bowel movements, a doctor prescribed Denson the laxative GoLytely.[16] After drinking the laxative, Denson had three drug-free bowel movements, the last of which occurred on February 16, 1997, at 9:45 a.m.[17] Thereafter, Customs Inspector Ganz informed Denson that she was to be released and proceeded to remove Denson's handcuffs and allowed her to dress. Hospital staff discharged Denson and Inspectors Friedland and Peggy Neaves drove her back to the Fort Lauderdale International Airport. At the airport, Denson retrieved her property and continued on her way. On February 28, 1997, Denson gave birth to Jordan L. Taylor.

---

[15] Arriving at Ward D, Friedland again handcuffed Denson to the bedrail in her room.

[16] Denson testified at trial that Friedland told her that she had to drink the laxative and pass three clear stools or she was not going to be able to leave. When Denson expressed concern about taking the laxative, Friedland responded that the doctors would not have prescribed her medication that they did not think she could have. Friedland denied making these statements.

[17] Inspector Smith's shift ended shortly before midnight on February 14; he did not have further contact with Denson. While it is unclear from the record when Friedland left the hospital on the night of the 14th, she returned the next afternoon and supervised Denson's second bowel movement at 4 p.m. Friedland's shift ended later that evening; she returned the next morning, February 16, to transport Denson back to the airport following her release.

B.

1.

Denson brought this lawsuit on November 12, 1998.[18]  Her complaint[19]

named as defendants Vince Priore, U.S. Customs Service Port Director for the Fort

Lauderdale International Airport, Lee Levenka, Supervisory Customs Inspector,

and Dennis Flynn and Cheryl Friedland, Customs Inspectors (collectively the

"Federal Defendants"),[20] the United States, Jackson Memorial Hospital[21] and Ira

Clark, its president (collectively the "Hospital"), and seven physicians[22] and six

---

[18]  Denson brought the suit individually and as guardian of Jordan L. Taylor.  Under
Florida law, a child who suffers prenatal injuries and is born alive has an independent cause of
action against the alleged tortfeasor.  Day v. Nationwide Mut. Ins. Co., 328 So. 2d 560, 562 (Fla
2d DCA 1976).  Nevertheless, since Jordan Taylor's tort claims are derivative of his mother's
claims, we will focus on the allegedly tortious treatment of Denson.

[19]  We refer to Denson's Second Amended Complaint as the complaint.  It was filed after
a panel of this court reversed the district court's dismissal of the Hospital and the Hospital
Defendants from the case and directed the district court to grant Denson leave to amend her
complaint.  Denson v. United States, 209 F.3d 724 (11th Cir. 2000) (unpublished table decision).

[20]  The complaint sought damages against the Federal Defendants in both their individual
and official capacities.  The district court, in its orders finally disposing of the claims in this
case, made no mention of the claims against the Federal Defendants in their official capacities.
We thus assume that the court denied those claims sub silentio.  In their briefs on appeal, the
parties do not mention them.

[21]  Although the complaint named Jackson Memorial Hospital as a defendant, the
complaint was served appropriately on Public Health Trust of Dade County, d/b/a Jackson
Memorial Hospital.

[22]  The physicians were Drs. John Bennett, Alexander Amadio, Ricardo Presas, Maurizio
Sepe, Jose Hernanedez, Gerald Kratz, and Lynn P. Carmichael.

14

nurses[23] on the hospital's staff (collectively the "Hospital Defendants"). Denson's eleven-count complaint is a prolix, discursive pleading that combines causes of action and theories of recovery in such a way as to make it exceedingly difficult, if not impossible, to grasp precisely the claims being asserted. Reading the complaint in the light most favorable to Denson, we find that it presents and lumps together, in its eleven counts, a host of claims under the Constitution and Florida tort law.[24]

The first eighty-two paragraphs of the complaint contain allegations that apply to each of the eleven counts. These paragraphs detail the events that transpired from the moment Inspector Friedland stopped Denson, after Denson cleared the primary Customs checkpoint at the airport, to the birth of Jordan. Count I incorporates the eighty-two paragraphs by reference; Counts II through XI incorporate by reference all antecedent allegations, such that each count consists of an amalgamation of all previous counts and causes of action.[25]

---

[23] The nurses were Illeana Hollant, Marie Prospere, Kenneth Reynauld, Gary Thompson, Doreen Simmons, and Gretchen Betlem.

[24] Denson brought the claims against the Federal Defendants under 28 U.S.C. § 1331, the claims against the United States under 28 U.S.C. §§ 1331 and 1346(b)(1), the federal law claims against the Hospital Defendants and the Hospital under 28 U.S.C. §§ 1331 and 1343, and the state law claims against the Hospital and Hospital Defendants under 28 U.S.C. § 1367.

[25] As indicated in the text following this footnote, the first 82 paragraphs of the complaint charge all of the defendants with every violation of the U.S. Constitution and Florida tort law that Denson allegedly suffered. Each numbered count, by incorporating those 82

15

The first eighty-two paragraphs of the complaint allege (1) that the conduct of the Federal Defendants constituted "false arrest, false imprisonment, intentional infliction of emotional distress, unlawful search and seizure, and unlawful invasion of privacy, under the laws of the State of Florida" and the "Fourth, Fifth, Eighth, and Fourteenth Amendments" of the Constitution, and discrimination on the basis of "race and ethnicity . . . in violation of the laws of Florida and the Fourth and Fifth Amendments," and (2) that the conduct of the Hospital Defendants constituted "assault, battery, false imprisonment, intentional infliction of emotional distress, unlawful search and seizure, unlawful invasion of privacy, and medical negligence under the laws of Florida . . . and "deliberate[] indifferen[ce] to [Denson's] serious medical needs . . . in violation of the Fifth, Eighth and Fourteenth Amendments." These eighty-two paragraphs also allege that "Defendants, and each of them, authorized and ratified the wrongful acts of the other individual defendants and were willful participants in the joint activity," all of which deprived Denson of her rights under Florida tort law and the federal constitution.

---

paragraphs by reference, therefore asserts all of these violations. In an effort to eliminate the intractable problem of isolating Denson's claims and reducing them to their bare essentials, we have limited the claims presented in the several counts by using the counts' headings, e.g., Count I, "Assault and Battery."

16

The counts alleged in the complaint are as follows: Count I, "Assault and Battery," brought against the Hospital Defendants, alleges that their physical contact with Denson at the hospital constituted assault and battery; Count II, "Medical Negligence," alleges that the Hospital Defendants breached the duty to provide Denson with appropriate medical care; Count III, "Medical Negligence," alleges that the Hospital is vicariously liable for the negligence of the Hospital Defendants; Count IV, "Apparent Agency," alleges that the Hospital is vicariously liable for the acts of the Hospital Defendants; Count V, "Non-Delegable Duty," alleges that the Hospital is liable for the acts of the Hospitable Defendants because the duties of those defendants were non-delegable; Count VI, "42 U.S.C. § 1983 and § 1985 Claims," brought against the Hospital Defendants, alleges that, while acting under the color of state law and in concert, they unlawfully searched, seized and detained Denson with excessive force, depriving her of her liberty and due process of law, all in violation of her rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments; Count VII, "42 U.S.C. § 1983 and § 1985 Claims," alleges that the Hospital is vicariously liable for the conduct described in Count VI; Count VIII, "Assault and Battery," alleges that the Federal Defendants "brutally, willfully, maliciously and without any excuse or justification . . . callously and recklessly . . . disregarded [Denson's] safety and continued life" in violation of

17

Florida tort law; Count IX, "Constitutional Violations Claim," which we construe as a <u>Bivens</u> claim,[26] alleges that the Federal Defendants, acting in concert, deprived Denson of her Fourth Amendment rights to be free from unreasonable searches and seizures, excessive force, and unlawful detention and her Fifth Amendment rights to the equal protection of the laws, due process of law, the right of privacy, freedom of association, and the right to seek redress for injury; Count X, "Constitutional Violations Claim," another <u>Bivens</u> claim, alleges that U.S. Customs Service Port Director Priore, acting under color of state and federal law, failed appropriately to "train, supervise and/or discipline" the Federal Defendants and, therefore, is liable for the constitutional violations asserted in Count IX; and Count XI, "Claim under the Federal Tort Claims Act," alleges that the United States is amenable to suit under the Federal Tort Claims Act (FTCA),[27] because the Federal Defendants subjected Denson to "warrantless detention, searches, handcuffing, assault, battery, forced medication and improper treatment" in violation of Florida tort law and the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution.[28]

---

[26] See <u>supra</u> note 1.

[27] See <u>supra</u> note 1 and accompanying text.

[28] Count XI's assertions that the Federal Defendants infringed Denson's rights under these constitutional amendments duplicated Count IX's <u>Bivens</u> claims. And, moreover, it was inappropriate to place these constitutional allegations in Count XI because the FTCA does not

The U.S. Attorney responded to the complaint on behalf of the United States and the Federal Defendants[29] by filing an answer, which denied paragraph by paragraph the allegations of unlawful conduct.[30] As an affirmative defense, the answer asserted that, with respect to the constitutional claims of Counts IX and X, the Federal Defendants were entitled to qualified immunity. The Hospital and Hospital Defendants responded by moving the court to grant them summary judgment on all claims.[31] Regarding the § 1983 claims asserted in Counts VI and VII, these defendants contended that they were entitled to qualified immunity.

On January 29, 2002, the district court entered an order disposing of all

---

provide jurisdiction for redress of constitutional torts.

[29] The U.S. Attorney's Office for the Southern District of Florida represented both the United States on Count XI, and the Federal Defendants on Counts IX and X, respectively.

[30] Given the manner in which Denson pled her complaint, the U.S. Attorney and the district court understandably had difficulty discerning which claims of which counts fell within the ambit of the FTCA, which claims were based on violations of Florida tort law, and which were based on violations of the U.S. Constitution. As a result, the U.S. Attorney had the United States substituted under the FTCA with respect to claims not covered by the FTCA, i.e., constitutional claims against the Federal Defendants. For example, the district court at some point during the litigation incorrectly combined Count IX, based on the U.S. Constitution with Count XI, based on Florida tort law and the U.S. Constitution, and substituted the United States as the defendant. The court treated Count X, a negligence claim against Priore, as a constitutional claim, and therefore did not substitute the United States for Priore as the defendant in that count. In this opinion, we have treated as claims against the United States only those asserting liability under Florida tort law.

[31] These defendants also moved the district court to dismiss Denson's claims under Fed. R. Civ. P. 12(b)(6). We are unable to determine from the record whether the court ever ruled on the motion.

pending motions for summary judgment.[32]  The court granted summary judgment

on Count I,[33] part of Count VI,[34] Counts VII and VIII,[35] part of Count IX,[36] and

---

[32]  In addition to disposing of the defendants' motions for summary judgment, the court struck the complaint's references to 42 U.S.C. § 1985 because none of the complaint's allegations supported a claim under § 1985.

[33]  The court granted summary judgment in favor of the Hospital Defendants on the ground that Fla. Stat. § 768.28 granted them immunity. See Jaar v. Univ. of Miami, 474 So. 2d 239, 245 (Fla. 3d DCA 1985) (applying § 768.28 immunity to doctors employed by the Public Health Trust of Miami Dade County d/b/a Jackson Memorial Hospital).

[34]  The district court disposed of the Count VI claims as follows: it dismissed (1) the claims Denson brought as guardian of Jordan L. Taylor; (2) the claims brought under 42 U.S.C. § 1985 against the Hospital and Hospital Defendants (for failure to prove a conspiracy among any of them); (3) the claims brought under 42 U.S.C. § 1983 against the Hospital and Hospital Defendants for non-consensual medical treatment; and (4) the claims brought under § 1983 against Drs. Amadio, Presas, Sepe, Hernandez, and Kratz and nurse Betlem for deliberate indifference to Denson's serious medical needs. The court granted in part and denied in part nurse Simmons's motion for summary judgment, dispositions we treat together as the denial of summary judgment. The court denied Dr. Bennett and nurses Hollant and Prospere summary judgment, and, for reasons not apparent in the January 29 order, did not rule on whether Dr. Carmichael or nurses Reynauld and Thompson were entitled to summary judgment.

[35]  The court granted summary judgment on Count VIII, the assault and battery claims against the Federal Defendants, on the ground that, at the time of the alleged assault and battery, the Federal Defendants were acting within the scope of their authority; therefore, the United States should be substituted as the defendant in lieu of the Federal Defendants. Because the Count XI claim against the United States was based in part on Count VIII's assault and battery allegations, the court found no need for Count VIII. Rather than dismissing Count VIII as duplicative of Count XI, however, the court granted the Federal Defendants summary judgment on Count VIII. The court apparently overlooked the fact that Count XI not only alleged assault and battery claims against the Federal Defendants, which were covered by the FTCA, but Fourth, Fifth, Eighth, and Fourteenth Amendment claims against them as well, which were not covered by the FTCA (because they were not based on Florida tort law) and which the United States therefore had no obligation to defend. Nonetheless, the U.S. Attorney assumed, albeit erroneously, that the United States could be held liable on those constitutional claims under the FTCA and, therefore, undertook to defend them on behalf of the United States.

[36]  The court granted the Federal Defendants summary judgment on Denson's claim as guardian of Jordan L. Taylor and on Denson's claim that the luggage search and pat down at the second Customs checkpoint infringed Denson's constitutional rights.

Count X, and denied summary judgment on Counts II through V[37] and part of Count VI, as it related to four of the Hospital Defendants, Dr. Bennett and nurses Hollant, Prospere, and Simmons (the "Four Hospital Defendants"), and part of Count IX.[38] In denying the Four Hospital Defendants summary judgment on Count VI, the court declined to pass on the question of whether they were entitled to qualified immunity.

2.

The Federal Defendants appealed the January 29 order,[39] arguing that the district court erred in denying them qualified immunity as to the <u>Bivens</u> claims asserted in Count IX. The Hospital and the Hospital Defendants also appealed, arguing that the court erred in denying them summary judgment on Counts II through V. Additionally, the Four Hospital Defendants appealed on the ground that the court erred in failing to address whether they were entitled to qualified

---

[37] The Hospital Defendants argued that the district court lacked subject matter jurisdiction to entertain these claims. The district court disagreed, concluding that it had supplemental jurisdiction under 28 U.S.C. § 1367 to litigate the claims; it therefore denied the Hospital Defendants' motion for summary judgment.

[38] The court denied summary judgment on the claim that Federal Defendants Friedland, Lavenka, and Flynn infringed Densons' constitutional rights in conducting the bathroom search at the airport and the pelvic examination at Jackson Memorial Hospital and in detaining Denson at the hospital for 24 hours. The court did not pass on the question of whether these three defendants were entitled to qualified immunity.

[39] The Federal Defendants filed their notice of appeal on March 28, 2002. Because the United States is a party in the case, their appeal had to be filed within 60 days of the entry of the January 29 order. <u>See</u> Fed. R. App. P. 4(a)(1)(B).

immunity on Count VI.  Denson cross appealed, arguing that the court erred in granting any of the defendants summary judgment.

In an order entered on July 12, 2002, a panel of this court granted Denson's motion to dismiss the Hospital and Hospital Defendants' appeal of the district court's denial of summary judgment on Counts II through V.  On January 29, 2003, the panel affirmed the district court's rulings on Count IX and, with respect to Count VI, remanded the case with instructions that the district court consider whether the Four Hospital Defendants were entitled to qualified immunity. See Denson v. United States, 61 F. App'x 669 (11th Cir. 2003) (unpublished table decision).

On remand, the district court, in an order entered on November 5, 2004, concluded that the Four Hospital Defendants were entitled to qualified immunity and granted them summary judgment on Count VI.  Since this ruling disposed of all the remaining bases for the court's exercise of original jurisdiction on Denson's claims against the Hospital Defendants and the Hospital,[40] the court declined to exercise its supplemental jurisdiction over Denson's remaining state law claims stated in Counts II, III, IV, and V; thus, it dismissed those counts in its November

---

[40]  In its January 29, 2002 order, the district court granted the Hospital summary judgment on Count VII, over which it had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Sections 1331 and 1343 also provided the court with jurisdiction to entertain Count VI.

22

5 order.[41]

Denson appealed the district court's November 5 order on December 2, 2004. On January 18, 2005, while her appeal was pending, she moved the district court, pursuant to Federal Rule of Civil Procedure 54(b), to enter a partial final judgment for the Hospital and Hospital Defendants in conformance with the rulings the court had handed down in their favor in its orders of January 29, 2002 and November 4, 2004.[42]   Denson's motion stated that there was "no just cause for delay" in entering the partial final judgment; moreover, a judgment, if entered, would afford Denson an opportunity to obtain "appellate review of the qualified immunity issues at this time."[43]  The court granted her motion, as framed, entering a partial final judgment for the Hospital and Hospital Defendants on February 16,

---

[41]  The November 5 order did not state that the dismissals were without prejudice. We assume that the dismissals were without prejudice because the order noted that Denson could continue pursuing her state law claims against the Hospital and Hospital Defendants in the Circuit Court of Dade County, Florida.  See Denson v. Public Health Trust of Dade County, Case No. 99-3722.

[42]  Denson moved the district court for the entry of a partial final judgment under Fed. R. Civ. P. 54(b) because this court had questioned the parties as to whether this court had jurisdiction to entertain the interlocutory appeal Denson had taken on December 2, 2004. On March 17, 2005, we dismissed Denson's interlocutory appeal for lack of an appealable order. The order of dismissal stated: "The district court's November 5, 2004 order is not final and appealable as it does not resolve all claims of all parties, and was not certified for an immediate appeal pursuant to Fed. R. Civ. P. 54(b)."  Denson v. United States, No. 04-16392 (11th Cir. Mar. 17, 2005).

[43]  A partial final judgment would also allow appellate review of the part of the November 5 order dismissing Counts II through V.

2005. Denson did not appeal the partial final judgment.

What remained of Denson's complaint following the entry of the Rule 54(b) judgment were Count IX, the <u>Bivens</u> claims against Inspectors Friedland, Lavenka, and Flynn for infringing Denson's rights under the Fourth and Fifth Amendments, and Count XI, the FTCA claims against the United States based on Florida tort law and the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution.

3.

On April 18, 2005, the case proceeded to a bifurcated trial on Counts IX and XI.[44] The two counts were tried simultaneously—Count IX to a jury[45] and Count XI to the court. On April 21, after three days of testimony, Denson voluntarily dismissed her claims against Inspector Flynn for lack of evidence[46] and rested her case on the two counts.[47] The U.S. Attorney then moved the district court for

---

[44] By agreement, the parties, with the court's consent, bifurcated Denson's claims and limited the trial to the issues of liability.

[45] Denson had made a timely demand that her <u>Bivens</u> claims be tried to a jury. By statute, FTCA claims are tried to the bench. <u>See</u> 28 U.S.C. § 2402.

[46] Nothing in the pretrial or trial records indicates that Flynn played a role in any way, directly or indirectly, in any of the events on which Denson based her claims against any of the defendants named in her complaint.

[47] Denson rested her case on Count XI subject to the court's reception of some documentary evidence, which she promptly introduced. Such evidence is not material to the disposition of her appeal of the judgment on Count XI.

24

judgment as a matter of law on both counts.[48]  He argued for judgment on the

Count IX claims on the ground that Friedland and Lavenka were entitled to

qualified immunity; and he argued for judgment on the Count XI claims on the

ground that Denson had failed to make out a case of liability under Florida tort

law.[49]  The court reserved ruling on the motion as addressed to Count IX and

denied the motion as addressed to Count XI.  Then, after both parties rested, the

district court proceeded to rule on the Count XI tort claims from the bench.  The

court found for the United States, and stated that it would memorialize its findings

of fact and conclusions of law in a written order, pursuant to Federal Rule of Civil

Procedure 52(a).  Turning to the <u>Bivens</u> claims in Count IX, the court found that

they were barred by 28 U.S.C. § 2676.[50]  Denson objected to the court's invocation

---

[48]  The U.S. Attorney framed his motions for judgment as a matter of law as motions for "directed verdicts."  We treat the motions as a Fed. R. Civ. P. 50(a) motion for judgment as a matter of law on Count IX and as a Fed. R. Civ. P. 52(c) motion for judgment on Count XI.  The motions differ in this respect.  A Rule 50(a) motion may be granted in the context here if the court, taking the evidence in the light most favorable to the plaintiff, concludes that a reasonable jury could not find for the plaintiff.  <u>Rossbach v. City of Miami</u>, 371 F.3d 1354, 1356 (11th Cir. 2004) (per curiam).  A Rule 52(c) motion may be granted if, in the context here and based on the evidence before it, the court finds, after resolving the credibility issues and weighing the evidence, for the defendant.  As it turned out, the court did not rule on the Rule 52(c) motion; instead, after both parties rested, it considered the evidence and made findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

[49]  Neither the parties nor the district court acknowledged the fact that Count XI included federal constitutional claims in addition to the Florida law tort claims.  Rather, they limited, albeit tacitly, the constitutional claims to those asserted in Count IX.

[50]  28 U.S.C. § 2676 provides:

The judgment in an action under [the FTCA] shall constitute a complete bar to

of the § 2676 bar on grounds that the bar only applies to cases where the United

States is unsuccessful in defending against the FTCA claim.[51]

4.

On June 30, 2005, Denson moved the district court, pursuant to Federal Rule

---

any action by the claimant, by reason of the same subject matter, against the
employee of the government whose act or omission gave rise to the claim.

A majority of courts have construed § 2676 as barring a plaintiff's <u>Bivens</u> claims, irrespective of
whether the <u>Bivens</u> and FTCA claims were brought in the same lawsuit. <u>Harris v. United States</u>,
422 F.3d 322, 334 (6th Cir. 2005) ("[W]e have held that [§ 2676] applies even when the claims
were tried together in the same suit and the judgments were entered simultaneously.") (alteration
omitted); <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d 840, 858 (10th Cir.
2005) (finding that entering judgment on <u>Bivens</u> claim before rendering judgment on FTCA tort
claim is "inconsequential" to the application of § 2676); <u>Farmer v. Perrill</u>, 275 F.3d 958, 962
(10th Cir. 2001) (holding that § 2676 barred <u>Bivens</u> claim because an FTCA claim based on
same subject matter was adjudicated in an earlier proceeding); <u>Rodriguez v. Handy</u>, 873 F.2d
814, 816 (5th Cir. 1989) ("'The moment judgment was entered against the government, then by
virtue of § 2676, [defendant] was no longer answerable to [claimant] for damages.'") (quoting
<u>Arevalo v. Woods</u>, 811 F.2d 487, 490 (9th Cir. 1987); <u>Aetna Cas. & Sur. Co. v. United States</u>,
570 F.2d 1197, 1201 (4th Cir. 1978) ("[A] judgment against the United States would
automatically bar the entry of any contemporaneous or subsequent judgment against
[government officials].").

Most courts have also found that § 2676 does not distinguish between judgments entered
for or against the United States. <u>Trentadue</u>, 397 F.3d at 858 ("[T]he judgment bar in § 2676
precludes plaintiffs from bringing a <u>Bivens</u> claim regarding the same subject matter regardless of
whether the final FTCA judgment is rendered in favor of a plaintiff or the government.");
<u>Farmer</u>, 275 F.3d at 963 ("Section 2676 makes no distinction between favorable and unfavorable
judgments—it simply refers to 'the judgment in an action under section 1346(b).'"); <u>Hoosier
Bancorp of Ind., Inc. v. Rasmussen</u>, 90 F.3d 180, 185 (7th Cir. 1996) ("There is no indication
that Congress intended [s]ection 2676 to apply only to favorable FTCA judgments."). <u>But see
Kreines v. United States</u>, 959 F.2d 834, 838 (9th Cir. 1992) (holding that § 2676 does not bar a
<u>Bivens</u> claim where the court enters judgment in favor of the United States under the FTCA and
the <u>Bivens</u> claim and FTCA claim are filed "contemporaneously").

[51] Denson did not object to the bar on the ground that it deprived her of her Seventh
Amendment right to a jury trial on her <u>Bivens</u> claims.

26

of Civil Procedure 60(b), to reconsider its November 5, 2004 order, which granted

the Four Hospital Defendants summary judgment on Count VI, and dismissed

Counts II through V.  Denson also moved the court to set aside the Rule 54(b)

partial final judgment of February 16, 2005, contending that the judgment was

invalid because it failed to recite that there was "no just reason for delay" in

entering the judgment.

5.

On August 5, 2005, the court issued its findings of fact and conclusions of

law on the Count XI FTCA claims.  The court found  (1) that Inspector Friedland

had reason to suspect that Denson was carrying narcotics internally; (2) that

Denson's responses to the questions Friedland put to her heightened Friedland's

suspicion; (3) that Friedland acted properly in seeking direction from her

supervisor, Lavenka; (4) that, based on what Friedland reported, Lavenka properly

instructed Friedland to take Denson to the Hospital, and (5) that Friedland's

handling of Denson at the Hospital was consistent with the protocol the U.S.

Customs Service followed in dealing with border entrants, like Denson, suspected

of carrying narcotics internally.  The court concluded that, based on these facts,

neither Friedland nor Lavenka committed the state law torts alleged in the

complaint, and that the United States was entitled to judgment on Count XI.

27

After finding for the United States on Count XI, the district court, on August 22, 2005, entered an order dismissing Count IX on the ground that Denson's Bivens claims were barred by 28 U.S.C. § 2676.

On August 24, 2005, the court denied Denson's Rule 60(b) motion to reconsider its November 5, 2004 order. On September 2, 2005, the U.S. Attorney moved the district court for entry of judgment in favor of Friedland and Lavenka on Count IX, pursuant to its August 22 order dismissing that count. On October 4, 2005, the court, having reserved ruling on Friedland and Lavenka's motions for judgment as a matter of law on Count IX, entered an order granting the motions on qualified immunity grounds. On October 6, 2005, the court entered final judgments in favor of Friedland and Lavenka on Count IX and the United States on Count XI. On October 11, 2005, the court denied Denson's June 30, 2005 motion to set aside the Rule 54(b) judgment.

### 6.

On October 12, 2005, Denson appealed the October 6 judgments and the August 24, 2005 order denying her Rule 60(b) motion for reconsideration of the court's November 5, 2004 order. Denson's appeal of the August 24 order is meritless, as we explain in the margin,[52] and thus unworthy of further comment.

---

[52] Fed. R. Civ. P. 60(b) authorizes a district court to relieve a party from a "final judgment, order, or proceeding." As we stated in our March 17, 2005 order dismissing Denson's

28

We devote our attention, instead, to Denson's challenges to the October 6 judgments.

## II.

### A.

Denson brought her Fourth Amendment claims against the Federal Defendants under Bivens, and state law claims against the United States (substituted for the Federal Defendants) under the FTCA.[53]  In Bivens, the Supreme Court created a remedial scheme to enforce justiciable constitutional

---

appeal of the November 5 order, the November 5 order was not "final,"and therefore not appealable, because the order had not resolved "all claims of all parties."  Denson v. United States, No. 04-16392 (11th Cir. March 17, 2005).  The November 5 order was merely tentative. The district court should have denied Denson's Rule 60(b) motion for the obvious reason that the November 5 order was not final.  The November 5 order was superceded and, therefore, made final by the Rule 54(b) judgment entered on February 16, 2005.  Denson did not appeal that judgment.  True, she moved the court on June 30, 2005, to set it aside because the order did not recite the statutory language that there was "no just reason for delay" for granting the motion, but the court denied the motion.  She apparently overlooked the fact that her motion represented to the district court that there was "no just cause for delay," and that the court accepted her representation in granting the motion as framed.  Under the circumstances, the fact that the court's order granting the Rule 54(b) judgment failed to contain the magic words, "no just reason for delay," did not render the judgment invalid.  Crowley Mar. Corp. v. Panama Canal Comm., 849 F.2d 951, 953 (5th Cir. 1998) (holding that district court was not required to recite the language "no just reason for delay," because party's motion contained such language; thus, district court's intent in issuing partial final judgment was readily apparent); St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688 (2d Cir.1989) (finding that court could exercise appellate jurisdiction in spite of the district court's failure to recite the statutory language if the record demonstrates that the district court could easily have provided acceptable reasons for granting the motion).

[53]  Denson also claimed that the Federal Defendants infringed her rights under the Fifth and Eight Amendments to the Constitution.  In her brief, she does not mention those amendments; thus, we treat her Fifth and Eight Amendment claims as abandoned.

rights. See Bivens, 403 U.S. at 395, 91 S. Ct. at 2004–05 (finding that victims of constitutional violations may seek monetary damages against the offending federal officers).  In contrast, the FTCA "is not a federal remedial scheme at all, but a waiver of sovereign immunity that permits an injured claimant to recover damages against the United States where a private person 'would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" Carlson v. Green, 446 U.S. 14, 29 n.1, 100 S. Ct. 1468, 1477 n.1, 64 L. Ed. 2d 15 (1980) (Powell, J., concurring) (quoting 28 U.S.C. § 1346(b)).  Although the FTCA was enacted many years before the Bivens decision came down, when Congress amended the FTCA in 1974 to permit claimants to bring causes of action against the United States based on intentional torts committed by law enforcement officers, see Pub. L. No. 93-253, 88 Stat. 50 (1974), Congress indicated that it viewed the FTCA and Bivens as parallel and complementary causes of action:

> [A]fter the date of enactment of this measure, innocent individuals who are subjected to raids [like those described in Bivens] will have a cause of action against the individual Federal agents and the Federal Government. Furthermore, this provision should be viewed as a counterpart to the Bivens case and its progenty [sic.], in that it waives the defense of sovereign immunity so as to make the Government independently liable in damages [under state law] for the same type of conduct that is alleged to have occurred in Bivens (and for which that case imposes liability upon the individual Government officials involved).

S. Rep. No. 93-588 (1974), reprinted in 1974 U.S.C.C.A.N. 2789, 2791; Pooler v.

United States, 787 F.2d 868, 874 (3d Cir. 1986) (Seitzer, J., concurring) (noting

that Congress crafted the law enforcement proviso amendment to § 2680(h) to be

co-extensive with actions brought under Bivens); see also Carlson v. Green, 446

U.S. at 20, 100 S. Ct. at 1472 (holding that plaintiffs, "[i]n the absence of a

contrary expression from Congress, . . . shall have an action under FTCA against

the United States as well as a Bivens action against the individual officials alleged

to have infringed their constitutional rights"); cf. FDIC v. Meyer, 510 U.S. 471,

485, 114 S. Ct. 966, 1005. 127 L. Ed. 2d 308 (1994) (explaining that the Court

"implied a cause of action against federal officials in Bivens in part because a

direct action against the government was not available [under the FTCA]" to

remedy constitutional tort claims)

  As co-extensive causes of action, Bivens and FTCA claims necessarily arise

from the same wrongful acts or omissions of a government official. By the same

token, the same set of facts determines the theories available to the United States in

defending the FTCA case. If a plaintiff sues the official under Bivens, but fails to

establish a constitutional violation, the United States may defend the plaintiff's

state-law tort claims (based on the Bivens evidence) under two theories. First, the

United States may contend that 28 U.S.C. § 2680(a) of the FTCA strips the district

court of jurisdiction to consider the tort claims because the officer acted within the

scope of his discretion when he engaged in the disputed conduct.[54]  Second, the

United States may contend that the Supremacy Clause of the Constitution bars the

tort claims because the application of the state tort law would impede the officer

from performing his required federal functions.  See U.S. Const, art. VI, cl.2

(providing that federal law is the supreme law of the land).  However, because

government officials lack discretion to violate constitutional rights, if the Bivens

claim is successful, neither defense would be available to the United States in the

FTCA case.  See Medina v. United States, 259 F.3d 220, 225 (4th Cir. 2001)

(noting that the starting point of analysis is the axiom that "federal officials do not

possess discretion to violate constitutional rights or federal statutes");  Red Lake

Band of Chippewa Indians v. United States, 800 F.2d 1187, 1196 (D.C. Cir.1986)

("A government official has no discretion to violate the binding laws, regulations,

or policies that define the extent of his official powers.")[55]  In the scenario at hand,

---

[54] 28 U.S.C. § 2680(a) provides an exception from the government's waiver of sovereign
immunity for

> Any claim based upon an act or omission of an employee of the Government,
> exercising due care, in the execution of a statute or regulation, whether or not
> such statute or regulation be valid, or based upon the exercise or performance or
> the failure to exercise or perform a discretionary function or duty on the part of a
> federal agency or an employee of the Government, whether or not the discretion
> involved be abused.

[55] That the discretionary function exception of § 2680(a) would not be available to the
United States when it is sued under the FTCA is implicit in the Supreme Court's holding in
Carlson v. Green.  By holding that the victim of a constitutional tort committed by a government

the availability of these defenses to the United States in the FTCA case depends on whether the evidence Denson presented against Inspectors Friedland and Lavenka in the <u>Bivens</u> case was sufficient to withstand their motion for judgment as a matter of law. Given this consequence, we begin our review of the two cases by assessing the legal sufficiency of Denson's <u>Bivens</u> case.

---

official has "parallel, complementary causes of action" under <u>Bivens</u> and § 2680(h) of the FTCA, the Court necessarily implied that the discretionary function exception of § 2680(a) does not apply to bar the district court from adjudicating the FTCA cause of action. <u>See</u> <u>Carlson</u>, 446 U.S. at 20, 100 S. Ct. at 1472. In other words, in committing a constitutional tort, a government official is not, "exercis[ing] or perform[ing], or . . . fail[ing] to exercise or perform a discretionary function or duty." <u>See</u> § 2680(a). Conversely, if the government official's conduct does not violate the Constitution (or a federal statute or regulation), the discretionary function exception may apply and preclude the district court from adjudicating whether the same evidence that failed to establish that the official violated the Constitution (or a federal statute or regulation) nonetheless established a tort under state law, <u>e.g.</u>, false arrest or false imprisonment.

In <u>Nguyen v. United States</u>, 556 F.3d 1244 (11th Cir. 2009), a case where DEA agents infringed the plaintiff's Fourth and Fifth Amendment rights by subjecting the plaintiff to false arrest and malicious prosecution, a panel of this court suggested that the discretionary function exception would not apply even had the agents not violated the plaintiff's constitutional rights. The plaintiff in <u>Nguyen</u> did not sue the federal agents under <u>Bivens</u>; instead, he sued the United States under § 2680(h) for false arrest and false imprisonment. Although the facts of the case demonstrated a clear constitutional violation, the district court dismissed the case under § 2680(a)'s discretionary function exception. This court reversed. Implementing a purposive approach to statutory construction, <u>see</u> H. Hart & A. Sacks, <u>The Legal Process: Basic Problems in the Making and Application of Law</u> 1411 (tent. ed. 1958) (William N. Eskridge, Jr. & Phillip P. Frickey eds., 1994) (arguing that primary concern in statutory construction is to give effect to the purpose of the statute; not the plain text), this court found that the exception did not apply, <u>see</u> Nguyen, 556 F.3d at 1256 ("To hold in this case that the discretionary function exception in subsection (a) trumps the specific proviso in subsection (h) would defeat what we know to be the clear purpose of the 1974 amendment."), implicitly indicating that the exception would not have applied even had the agents not violated the Constitution.

As indicated in part III, <u>infra</u>, we conclude that the Supremacy Clause bars Denson's FTCA tort claims. Consequently, we need not consider whether § 2680(a) is implicated where, as here, the government officials properly discharged their statutory and regulatory duties within the bounds fixed by the Constitution.

B.

Denson sued Inspectors Friedland and Lavenka in their individual capacities. At trial, after Denson rested her case, the U.S. Attorney, contending that the defendants were entitled to qualified immunity as a matter of law, moved the court to dismiss her <u>Bivens</u> claims under Federal Rule of Civil Procedure 50(a).[56]  The court granted the motion.[57]

Qualified immunity is a doctrine that generally shields "[g]overnment officials performing discretionary functions . . . from liability for civil damages

---

[56] The complete text of Rule 50(a) is as follows:

(a) Judgment as a Matter of Law.
    (1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
        (A) resolve the issue against the party; and
        (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
    (2) Motion. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

[57] The district court alternatively ruled that 28 U.S.C. § 2676 barred Denson's <u>Bivens</u> claims.  Because, as indicated <u>infra</u>, we conclude that Denson failed as a matter of law to establish that the defendants infringed her constitutional rights and that her <u>Bivens</u> claims should have been dismissed under Rule 50(a) for that reason, we need not address the § 2676 issue. <u>See Koziara v. City of Casselberry</u>, 392 F.3d 1302, 1306 n.2 (11th Cir. 2004) ("[W]e may affirm the district court's judgment on any grounds supported in the record.").
    We come to the decision that Denson failed to establish her <u>Bivens</u> claims by "applying the same standard as the district court." <u>Cleveland v. Home Shopping Network, Inc.</u>, 369 F.3d 1189, 1192 (11th Cir. 2004).  In doing so, we view the evidence in the light most favorable to Denson, the nonmovant. <u>Thosteson v. United States</u>, 331 F.3d 1294, 1298 (11th Cir. 2003).

insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982); see also Anderson v. Creighton, 483 U.S. 635, 638–639, 107 S. Ct. 3034, 3038–39, 97 L. Ed. 2d 523 (1987); Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003). Thus, a government official is shielded from liability in two scenarios: (1) the claimant fails to establish that the official violated her rights; or (2) the claimant establishes a violation of rights that are not "clearly established." See Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009). Denson's case fits the first scenario hand in glove, as we explain below.

1.

The Fourth Amendment is a classic repository of constitutional rights. It serves as a bulwark, protecting individual liberty from arbitrary invasions by state actors. See Wolf v. People of State of Colorado, 338 U.S. 25, 27–28, 69 S. Ct. 1359, 1361, 93 L. Ed. 1782 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). To that end, the proscriptions found in the Fourth Amendment impose a benchmark of reasonableness upon the exercise of governmental discretion. Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660 (1979); Marshall v.

35

Barlow's, Inc., 436 U.S. 307, 312, 98 S. Ct. 1816, 1820, 56 L. Ed. 2d 305 (1978). Whether a search or seizure is constitutionally reasonable is judged by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." United States v. Montoya de Hernández, 473 U.S. 531, 537, 105 S. Ct. 3304, 3308, 87 L. Ed. 2d 381 (1985); Brown v. Texas, 443 U.S. 47, 50–51, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357 (1979); Camara v. Municipal Court, 387 U.S. 523, 534, 87 S. Ct. 1727, 1734, 18 L. Ed. 2d 930 (1967).

While true that Fourth Amendment protections apply irrespective of a person's location, those protections do wane in some limited contexts. This is especially true at the international border—or its functional equivalent, e.g., an airport[58]—where the government's interest in preventing persons and effects from entering the nation rises to its zenith. United States v. Flores-Montano, 541 U.S. 149, 152–53, 124 S. Ct. 1582, 1585, 158 L. Ed. 2d 311 (2004). In fact, the very balance of reasonableness "is qualitatively different at the international border than in the interior." Montoya de Hernández, 473 U.S. at 538, 105 S. Ct. at 3309. "[N]ot only is the expectation of privacy less at the border than in the interior, the

---

[58] See Almeida-Sanchez v. United States, 413 U.S. 266, 272–73, 93 S. Ct. 2335, 2539, 37 L. Ed. 2d 596 (1973); United States. v. Hill, 939 F.2d 934 (11th Cir. 1991) (holding that "[b]ecause people can enter the country at points other than along the actual border, courts look to whether the point of entry is the functional equivalent of the border.").

Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." Id. at 539–40, 105 S. Ct. at 3309–10 (internal citations omitted). It is beyond peradventure that searches made at the border, pursuant to the long-standing right of the sovereign to protect its territorial integrity, renders preliminary searches and seizures per se reasonable simply by virtue of the fact that they occur at the border United States v. Ramsey, 431 U.S. 606, 616, 97 S. Ct. 1972, 1978, 52 L. Ed. 2d 617 (1977). Entrants, therefore, are subject to search even in the absence of reasonable suspicion, probable cause, or warrant. Id. at 619, 97 S. Ct. at 1980; Almeida-Sanchez, 413 U.S. at 272, 93 S. Ct. at 2539, 37 L. Ed. 2d 596 (1973) (noting that the federal government may conduct "routine inspections and searches of individuals or conveyances seeking to cross our borders"); Carroll v. United States, 267 U.S. 132, 154, 45 S. Ct. 280, 285, 69 L. Ed. 543 (1925) ("Travelers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in and his belongings as effects which may be lawfully brought in.").

The Government's interest in policing our borders has grown exponentially in the present era of foreign drug trafficking. See United States v. Mendenhall,

446 U.S. 544, 561, 100 S. Ct. 1870, 1880, 64 L. Ed. 2d 497 (1980) (Powell, J.,

concurring) (noting that the public "has a compelling interest" to stop the flow of

illegal drugs from entering the United States).  Stopping the flood of illicit drugs

pouring into the United States has become particularly difficult as drug syndicates

develop new techniques to prevent detection.  One technique in the smuggler's

repertoire, which has been utilized for more than three decades, is alimentary canal

smuggling.[59]  See Montoya de Hernández, 473 U.S. at 538–39, 105 S. Ct. at 3309.

This dangerous and depraved practice remains a staple method for smuggling

because it is exceedingly difficult to detect.  Id.

     To combat the long existing and ever present problem of contraband

smuggling, Congress expanded the Customs Office's scope of authority by

enacting 19 U.S.C. § 1582.[60]  This statute provides that "all persons coming into

the United States from foreign countries shall be liable to detention and search. . .

authorized . . . [by customs regulations]."  Pursuant to its Congressionally

delegated authority, U.S. Customs responded by drafting and adopting 19 C.F.R.

_____

[59] See supra note 2.

[60] 19 U.S.C. § 1582 provides:

The Secretary of the Treasury may prescribe regulations for the search of persons
and baggage and he is authorized to employ female inspectors for the examination
and search of persons of their own sex; and all persons coming into the United
States from foreign countries shall be liable to detention and search by authorized
officers or agents of the Government under such regulations.

§§ 162.6 and 162.7, which provide that "[a]ll persons, baggage, and merchandise arriving in the . . . United States from places outside thereof are liable to inspection" and that Customs officers "may stop, search, and examine any vehicle, person, or beast, or search any trunk or envelope wherever found."[61]

As a whole, the law provides that when Customs Officers first encounter an individual seeking entry into the United States the officer has discretion to stop the person and conduct a preliminary border search without fear of running afoul of the Constitution. Ramsey, 431 U.S. at 619, 97 S. Ct. at 1980. Included within the officer's discretion is an entitlement to conduct routine questioning, Kaniff v. United States, 351 F.3d 780, 784 (7th Cir. 2003), examine the entrant's luggage, and conduct Terry patdowns and frisks, United States v. Vega-Barvo, 729 F.2d 1341, 1345 (11th Cir. 1984); see also Bradley v. United States, 299 F.3d 197, 203–04 (3d Cir. 2002); United States v. Beras, 183 F.3d 22, 25–26 (1st Cir. 1999); United States v. Vargas, 854 F.2d 1132, 1134 (9th Cir. 1988); United States v. Carreon, 872 F.2d 1436, 1442 (10th Cir. 1989); United States v. Oyekan, 786 F.2d 832, 835 (8th Cir. 1986). Because an individual's expectation of privacy is at its lowermost at border entry points, the officer need not possess any level of

---

[61] Courts have explicitly deemed § 1582 and its implementing regulations constitutional. United States v. Scheer, 600 F.2d 5, 7 (3d Cir. 1979); United States v. Pringle, 576 F.2d 1114, 1117 (5th Cir. 1978); United States v. Odland, 502 F.2d 148, 151 (7th Cir.), cert. denied, 419 U.S. 1088, 95 S. Ct. 679, 42 L. Ed. 2d 680 (1974).

suspicion. <u>Vega-Barvo</u>, 729 F.2d at 1344 ("A person's decision to cross our national boundary is justification enough for such a search."); <u>United States v. Gonzalez-Rincon</u>, 36 F.3d 859, 864 (9th Cir. 1994) (finding that routine searches are reasonable under the Fourth Amendment "by the single fact that the person or item in question has entered into our country from outside.")

2.

When Denson entered the United States, Friedland stopped her, conducted a search of her belongings, asked her routine questions, and conducted a <u>Terry</u>-style pat down. These actions fall well within the scope of routine border searches and accordingly, do not offend the Fourth Amendment. <u>See</u> <u>Brent v. Ashley</u>, 247 F.3d 1294, 1299–1300 (11th Cir. 2001) (holding that the stop, questioning, and luggage search of an entrant constituted a routine border search); <u>Vega-Barvo</u>, 729 F.2d at 1345 ("Both a luggage search and a pat-down or frisk fall within [routine border searches] and these searches can be legitimately carried out on no more than a generalized 'mere suspicion' or 'subjective response' of the [C]ustoms inspector. A person's decision to cross our national boundary is justification enough for such a search."). Denson's suggestion that Friedland's initial actions were rendered unconstitutional because Friedland's decision to stop and search her was racially motivated is of no moment.

40

If, after conducting initial questioning and a preliminary search of the individual and the individual's effects, the officer has reasonable suspicion that the traveler is smuggling drugs in her alimentary canal, the Fourth Amendment permits the Customs officer to detain the individual and conduct a more intrusive search. Montoya de Hernández, 473 U.S. at 541–42, 105 S. Ct. at 3310–11 (allowing detention of traveler based on reasonable suspicion of smuggling contraband in her alimentary canal); United States v. Pino, 729 F.2d 1357, 1359 (11th Cir. 1984) (finding use of x-ray to search traveler constitutional where reasonable suspicion exists that person is concealing drugs internally); see United States v. Himmelwright, 551 F.2d 991, 994 (5th Cir.) cert. denied, 434 U.S. 902, 98 S. Ct. 298, 54 L. Ed. 2d 189 (1977)[62] (permitting strip search of border entrant based upon reasonable suspicion).  Similarly, once an officer gains reasonable suspicion that a traveler is smuggling drugs in her alimentary canal, it is constitutionally reasonable for the officer to detain the traveler for a period of time necessary to either verify or dispel his suspicion. Montoya de Hernández, 473 U.S. at 544, 105 S. Ct. at 3312; Gonzalez-Rincon, 36 F.3d at 864.

Whether reasonable suspicion exists to justify more intrusive searches is a

---

[62] In Bonner v.  City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

fact specific inquiry, requiring courts to take into account all of the facts known to

the officer at the time of the search.  United States v. Arvizu, 534 U.S. 266,

273–74, 122 S. Ct. 744, 750–51, 151 L. Ed. 2d 740 (2002).  Taking the totality of

the circumstances into account, "officials at the border must have a particularized

and objective basis for suspecting the particular person of alimentary canal

smuggling."  Montoya de Hernández, 473 U.S. at  541–42, 105 S. Ct. at 3311.

Reasonable suspicion requires more than mere fanciful conjecture; it must be based

upon a "particularized and objective basis for suspecting the particular person . . .

of criminal activity."  United States v. Cortez, 449 U.S. 411, 417–18, 101 S. Ct.

690, 695, 66 L. Ed. 2d 621 (1981).  Although this standard imposes limits on a

Customs official's discretion after an individual has crossed the border, it relaxes

the normal warrant requirement of probable cause in recognition of the "many

difficulties that attend the attempt[s] to intercept  contraband and to apprehend

increasingly mobile and sophisticated smugglers."  United States v. Bilir, 592 F.2d

735, 739–40 (4th Cir. 1979)

Recognizing that reasonable suspicion is a concept of a most feline

character, the Supreme Court sought to provide some instruction on applying the

concept in the border smuggling context in Montoya de Hernández.  There, the

Supreme Court found that Customs inspectors had reasonable suspicion to search

and detain a woman traveling to the United States from Bogata, Columbia—a "source city" for illegal drugs according to Customs officials. Montoya de Hernández, 473 U.S. at 541, 105 S. Ct. at 3311. The woman first aroused suspicion when a Customs inspector noticed from her passport that she had made eight recent trips to either Miami or Los Angeles from Bogata. See id. at 533, 105 S. Ct. at 3306. After further questioning, the woman revealed that she did not speak English and had no family or friends in the United States. Id. She further revealed that she did not have a hotel reservation and she could not remember who purchased her airline ticket. Id. After searching her luggage, the inspector discovered the woman was carrying $5,000 in cash and was only carrying "cold weather" clothes. Id. at 533–34, 105 S. Ct. at 3306. Suspecting the woman of alimentary canal smuggling, he requested a female Customs inspector take the woman to a private area and perform a patdown and strip search. Id. at 534, 105 S. Ct. at 3307. Although the female inspector failed to find any contraband, she did discover that the woman's abdomen was firm and full and she was wearing two pairs of elastic undergarments with a paper towel lining in the crotch area. Id. Based on all the facts and circumstances, the inspectors detained the woman for sixteen hours and, despite her "heroic efforts to resist the usual calls of nature," the inspectors discovered that the woman was carrying over eighty-eight balloons containing a total of 528 grams of cocaine in her alimentary canal Id.

43

Similarly, in United States v. Gonzalez-Rincon, 36 F.3d 859 (9th Cir. 1994), cert. denied, 514 U.S. 1008, 115 S. Ct. 1323, 131 L. Ed. 2d 203 (1995), the Ninth Circuit found that Customs inspectors had reasonable suspicion that a traveler was an alimentary canal smuggler because she (1) was traveling from a source city (Bogata, Columbia), (2) had paid cash for her plane ticket, (3) was carrying only one piece of luggage, although she told the inspectors she was planning on staying in the United States for fifteen days, (4) gave inconsistent statements regarding the purpose of her trip, (5) her passport reflected numerous entries into the United States, and (6) she appeared nervous and perspired heavily while being interviewed. Id. at 863. These facts were sufficient to justify the Customs inspectors' decision to strip search the woman, x-ray her abdomen, and monitor her bowel movements. Id.

In this case, when Friedland decided to accompany Denson to the restroom and perform a search, she knew that Denson (1) had arrived from Jamaica, a "source country," (2) was a single traveler carrying no carry-on luggage, (3) displayed signs of nervousness during questioning, (4) was pregnant and accordingly, it was impossible for medical professionals to take an x-ray of her stomach or gastrointestinal tract—making her a desirable drug "mule," (5) provided inconsistent statements about the purpose of her trip, (6) stated she was married but could not provide her husband's phone number, (7) had only stayed in

44

Jamaica for one and a half days, (8) provided a dubious story about how she attained her plane ticket, (9) gave unverifiable employment information, and (10) was in possession of a hand-written "cover story" written by someone else. Based on these facts, it was eminently reasonable for Friedland, especially given her experience and training, to suspect that Denson was concealing contraband. See Gonzalez-Rincon, 36 F.3d at 863.

Denson argues, however, that even assuming that Friedland had reasonable suspicion to conduct the restroom search,[63] her failure to find drugs during that search should have allayed her suspicion rather than given rise to the suspicion that she was carrying drugs internally. She insists that Friedland's decision (which was affirmed by the Acting Port Director, Lavenka) to detain her and have her taken to a hospital—so that medical professionals and Customs officers could monitor her bowel movements—was based on nothing more than a classic drug courier profile, insufficient to support reasonable suspicion.

If we were to accept Denson's argument that the negative results of the searches should have allayed all suspicion, we would turn the reasonable suspicion standard on its head. Under Denson's theory, whether an officer possesses

---

[63] Because we find that the Customs inspectors had a reasonable suspicion prior to the restroom search that Denson was an internal narcotics courier, we need not decide whether the particular search rose to the level of a "strip search." See Vega-Barvo, 729 F.2d at 1345 (asserting that a Customs officer must have a reasonable suspicion before conducting a strip search).

reasonable suspicion is measured by the result of the search and not the facts and circumstances that led to the officer's decision to conduct the search. Surely, Denson does not suggest that the absence of reasonable suspicion is constitutionally remedied if the officer discovers contraband during the search.

Eschewing such an ex post approach, the Supreme Court has consistently held that whether an officer has reasonable suspicion is determined by all the facts known to the officer before and during the search. See Montoya de Hernández, 473 U.S. at 541–42, 105 S. Ct. at 3311; Arvizu, 534 U.S. at 273–74, 122 S. Ct. at 750–51. The inspector's failure to discover drugs or other facts that would indicate alimentary canal smuggling—such as the traveler carrying antidiarrheal medication, see United States v. Chukwbike, 956 F.2d 209, 210 (9th Cir. 1992), or wearing multiple pairs of undergarments lined with paper towels, see Montoya de Hernandez, 473 U.S. at 534, 105 S. Ct. at 3307—does not necessarily diminish a Customs inspector's suspicions. Indeed, an absence of proof is not proof of absence.

If, after considering all the facts and circumstances at hand, an experienced Customs inspector reasonably suspects that an individual is a drug smuggler, failing to find illicit drugs externally could raise a reasonable suspicion in the inspector's mind that the traveler is carrying drugs internally. See United States v. Oyekan, 786 F.2d 832, 834 (8th Cir. 1986) (noting that even though strip search

46

revealed no evidence of drugs or paraphernalia associated with alimentary canal smuggling, reasonable suspicion supported detention for x-ray and monitored bowel movements of two women from a source country who carried small amount of luggage, paid cash for tickets, and told implausible stories about their purpose for traveling to the United States); Vega-Barvo, 729 F.2d at 1350 (finding that inspectors had reasonable suspicion of internal smuggling and could proceed with an x-ray following a negative strip search where suspect was traveling alone from a source country, carried a single piece of luggage, and told an implausible story regarding her employment).

Once acquiring reasonable suspicion, Friedland, with Lavenka's approval, could legally detain Denson for "the period of time necessary to either verify or dispel the suspicion," including transporting Denson to the hospital for a pelvic exam and, if necessary, monitored bowel movements. See Montoya de Hernandez, 473 U.S. at 544, 105 S. Ct. at 3312, 87 L. Ed. 2d 381; United States v. De Montoya, 729 F.2d 1369, 1371 (11th Cir. 1984) (permitting Customs inspectors to detain suspect until he excreted his stomach's contents where inspectors reasonably suspected narcotics trafficking); United States v. Henao-Castano, 729 F.2d 1364, 1366 (11th Cir. 1984) (permitting officers to handcuff suspect to a chair because handcuffing "was a reasonable method of preventing [suspect] from attempting to dispose of the contents of his stomach before they could be searched."); United

47

States v. Saldarriaga-Marin, 734 F.2d 1425, 1428 (11th Cir. 1984) ("Once the Customs [O]fficers developed reasonable suspicion that [suspect] was an internal carrier, they could permit nature to run its course or ask [him] to speed up the process by taking [a] laxative"); United States v. Himmelwright, 551 F.2d 991, 995 (5th Cir. 1977) (allowing strip and body cavity searches upon reasonable suspicion "that contraband exists in the particular place which the officials decide to search"); Lane v. United States, 321 F.2d 573, 576 (5th Cir. 1963) (holding that "[a]dministering emetics to cause vomiting in order to recover narcotics is not an unreasonable search of the person.").[64]

We further note that our decision today promotes sound social policy and provides Customs inspectors a degree of flexibility and protection as they work to secure our borders. In this case, after confronting, questioning, and searching Denson, Friedland presented Lavenka with evidence supporting a reasonable suspicion that Denson was concealing drugs internally. At this point, the

---

[64] As both Friedland and Lavenka acknowledged, as a pregnant, black female traveling alone from a brief stay in Jamaica, Denson fit a stereotypical profile. And if Friedland and Lavenka based their decision to search and have Denson detained to monitor her bowel movements solely on those facts, this would be a different case. See Brent v. Odesta, 247 F.3d 1294, 1302 (11th Cir. 2001) (finding officers lacked reasonable suspicion to conduct a strip search and an x-ray examination based on the traveler having arrived from a source country and shaking her head at inspectors who had detained another passenger); United States v. Vega-Barvo, 729 F.2d 1341, 1349 (11th Cir. 1984) ("It is not the profile, however, but the factors which make up the profile which are crucial to whether or not there is a reasonable suspicion.") However, Friedland and Lavenka's decisions were based not only on a basic profile but also on Denson's nervous behavior, the dubious nature of Denson's answers to basic questions, and other factors—most notably, the third-party authored cover story.

inspectors had a simple, but difficult, choice to make: subject the obviously pregnant Denson to an invasive series of searches or let her go. Denson argues that they should have opted for the latter choice irrespective of any adverse social consequences. Yet, such a rule would force Customs inspectors to capitulate to drug traffickers who decide to employ such depraved tactics, while simultaneously creating an incentive for drug traffickers to continue using pregnant females to internally smuggle drugs across our borders.[65] Such collateral consequences strongly militate against giving effect to such a theory.

In sum, based on the facts and circumstances Friedland and Lavenka encountered, we conclude that they acted reasonably and thus, did not violate the Fourth Amendment.[66] The judgment of the district court in Denson's <u>Bivens</u> case is accordingly affirmed.

III.

---

[65] By creating such incentives, drug traffickers will lure more pregnant women into packing their bodies with dangerous drugs. This technique is quite dangerous because the balloons or condoms, which are used as packages for the drugs, can burst or leak, causing potentially fatal drug intoxication. <u>See</u> <u>United States v. Ibekwe</u>, 760 F. Supp. 1546, 1558 (M.D. Fla. 1991); Stephen J. Traub, <u>Body Packing—The Internal Concealment of Illicit Drugs</u>, 349 New Eng. J. Med. 2519 (2003).

[66] In granting their motion for judgment as a matter of law on the ground that they were entitled to qualified immunity, the district court did not indicate whether Friedland and Lavenka were entitled to qualified immunity because Denson failed to prove that their conduct violated the Fourth Amendment or that their conduct, though challengeable, did not violate "clearly established" Fourth Amendment "rights of which a reasonable [Customs officer] would have known." <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 808, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). We conclude that they are entitled to qualified immunity because Denson failed to prove a Fourth Amendment violation.

Because Denson failed to prove a constitutional violation in her <u>Bivens</u> case, the United States had at its disposal two defenses to her state tort law claims: (1) a jurisdictional defense provided by 28 U.S.C. § 2680(a)—the discretionary function exception; and (2) an affirmative defense under the Supremacy Clause of the Constitution. Because we find that Denson's state tort law claims are barred by the Supremacy Clause, we need not consider the applicability of the discretionary function exception and whether jurisdiction exists to entertain them.[67]

As we consider whether the Supremacy Clause bars Denson's state tort law claims, we are ever mindful that this case involves the actions of federal officers charged with safeguarding the United States border—a locus where the federal interest rises to its zenith—and of the extent to which those actions may be regulated by application of state law. To be sure, the U.S. Constitution strictly allocates the responsibility for policing international borders to the federal government,[68] and officers of the United States are solely charged with carrying

---

[67] In her complaint in the FTCA case, Denson asserted a claim for intentional infliction of emotional distress. We summarily dismiss this claim as it is not one of the torts enumerated within § 2680(h). <u>See</u> 28 U.S.C. § 2680(h) (listing the torts of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution).

[68] The U.S. Constitution provides that Congress shall have the power "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

out that mandate.[69] While the power to control who and what enters the country is explicitly declared within the text of the Constitution itself, this power antedates the adoption of the Constitution and "is based on [the sovereign's] inherent authority to protect its territorial integrity." Torres v. Puerto Rico, 442 U.S. 465, 472–73, 99 S. Ct. 2425, 2430, 61 L. Ed. 2d (1979); see also Ramsey, 431 U.S. at 620, 97 S. Ct. at 1980. With this in mind, we must determine whether Denson can assert her state law tort claims even though Friedland and Lavenka have otherwise complied with federal law. A thorough examination of the Supreme Court's Supremacy Clause jurisprudence convinces us that the answer to this question is no.

It is a basic tenet of "Our Federalism"[70] that where federal and state law conflict, state law must yield. This principle is captured in Article VI of the Constitution, which reads: "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . ., any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. Soon after the creation of our federal system, the Supreme Court explained that the Supremacy Clause was

---

[69] See, e.g., 8 U.S.C. § 1103 (charging the Secretary of Homeland Security, the Attorney General, and the Under Secretary of Homeland Security with certain responsibilities relating to border security).

[70] See Younger v. Harris, 401 U.S. 37, 44–45, 91 S. Ct. 746, 750–51, 27 L. Ed. 2d 669 (1971).

designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436, 4 L. Ed. 579 (1819); see also Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23 (1824) (Marshall, C.J.) ("[A]cts of the State Legislatures . . . [that] interfere with, or are contrary to the laws of Congress [are to be invalidated because] [i]n every such case, the act of Congress . . . is supreme, and the law of State, though enacted in the exercise of powers not controverted, must yield to it.").

While the Supremacy Clause allows Congress to enact legislation free of any impediment or interference by state law, see Gade v. Nat'l Solid Waste Mgmt. Assoc., 505 U.S. 88, 108, 112 S. Ct. 2374, 2388, 120 L. Ed. 2d 73 (1992), it jointly serves to prevent state law or state law officials from interfering with or otherwise impeding federal officers as they perform their lawful duties, see Tennessee v. Davis, 100 U.S. 257, 263, 25 L. Ed. 648 (1880) ("No state government can exclude [the federal government] from the exercise of any authority conferred upon it by the Constitution [or] obstruct its authorized officers against its will . . . ."). The Supreme Court further explicated this maxim in In re Neagle, 135 U.S. 1, 10 S. Ct. 658, 34 L. Ed. 55 (1890), where California sought to prosecute a United States deputy marshal assigned to protect Justice Stephen Field during his circuit assignment after the marshal shot and killed an angry litigant. In Neagle, the Court

held that the marshal was immune from state prosecution: "[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the state of California." Id. at 75, 10 S. Ct. at 672.  The Court explained that under the Constitution, the United States "may, by means of physical force, exercised through its official agents, execute . . . the powers and functions that belong to it" free from the interference of state law.[71]  Id. at 60–61, 10 S. Ct. at 667; see Davis, 100 U.S. at 262 (1879) (noting that the government can act only through its officers and agents, who must act within the States' territories, and allowing state law to interfere with

---

[71] The Supremacy Clause has also been invoked in cases where a state criminal defendant argues that he should have been allowed to suppress evidence obtained by a federal border agent under the applicable state constitution.  For example, in State v. Coburn, 683 A.2d 1343 (Vt. 1996), a man convicted of drug possession in state court argued that his motion to suppress evidence obtained by U.S. Customs agents should have been granted because their search and seizure violated the Vermont Constitution.  Citing the Supremacy Clause and Art I., § 8, cl 3 (regulation of commerce with foreign nations), the Vermont Supreme Court held that "the Vermont Constitution does not apply to the conduct of federal government officials acting under the exclusive federal authority to safeguard the borders of the United States." Id. at 1347.  In reaching its decision, Coburn cited cases from several other states that had held similarly.  See e.g., People v. Mitchell, 79 Cal. Rptr. 764, 767 (1969) ("A border search by a United States Customs Officer is lawful; does not depend upon probable cause; and is not governed by state laws."); Morales v. State, 407 So.2d 321, 329 (3d Fla DCA 1981) (holding that evidence seized by U.S. Customs officers pursuant to reasonable border search is permissible under Florida constitution); State v. Allard, 313 A.2d 439, 451 (Me. 1973) (finding no state constitutional violation where U.S. Customs officer turned over evidence to state police); State v. Bradley, 719 P.2d 546, 549 (Wash. 1986) ("Neither state law nor the state constitution can control federal officers' conduct [during a border search].").

government officers would paralyze governmental functions); <u>Martin v. Hunter</u>, 14

U.S. (1 Wheat. 363) 304, 363, 4 L. Ed. 97 (1816) (Johnson, J., concurring) ("[T]he

general government must cease to exist whenever it loses the power of protecting

itself in the exercise of its constitutional powers. Force, . . . , or judicial process, . .

. , are the only means to which governments can resort in the exercise of their

authority.").

   Although <u>Neagle</u> considered the question of whether the Supremacy Clause

would countenance a state's criminal prosecution of a federal officer performing

his duties, its teaching has broader application. It not only spares federal officers

from trial in a potentially hostile state venue, <u>see also</u> <u>Willingham v. Morgan</u>, 395

U.S. 402, 407, 89 S. Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969) (noting that "federal

officers, and indeed the Federal Government itself, require the protection of a

federal forum"), but also imparts a framework for deciding whether the Supremacy

Clause bars the application of state law to claims arising out of the conduct of

federal actors. The scheme requires that courts consider whether the officer "was

authorized to do [what he did] by the law of the United States," whether "it was his

duty to do [it] as [an officer] of the United States," and whether "in doing that act

he did no more than what was necessary and proper for him to do." <u>Neagle</u>, 135

U.S. at 57, 10 S. Ct. at 666. If the answer to these three questions is yes,

conflicting state law is ineffectual.

54

Although setting out three distinct questions for analysis, at bottom, Neagle stands for the proposition that an officer of the United States cannot be held in violation of state law while simultaneously executing his duties as prescribed by federal law. An act cannot simultaneously be necessary to the execution of a duty under the laws of the United States and an offense to the laws of a state. On the contrary, the obligations imposed by federal law are supreme, and where any supposed right or claim under state law would impede an officer from performing his duties, it must relent. Johnson v. Maryland, 254 U.S. 51, 56–57, 41 S. Ct. 16, 65 L. Ed. 126 (1920) (Holmes, J.) ("[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States."); Ohio v. Thomas, 173 U.S. 276, 283, 19 S. Ct. 453, 455, 43 L. Ed. 699 (1899) ("When discharging [their] duties under [F]ederal authority pursuant to and by virtue of valid Federal laws, [Federal officers] are not subject to arrest or other liability under the laws of the State in which their duties are performed.").

Accordingly, for purposes of the FTCA case before us, assessing whether the United States is amenable to liability under state law for the allegedly tortious conduct of Friedland and Lavenka requires reference to federal law. Conflating somewhat the elements of the Neagle test for simplicity's sake, we look to (1)

55

whether the officers were acting "within the outer perimeter of [their] line of duty" as defined by federal statutory and regulatory law, Barr v. Matteo, 360 U.S. 564, 575, 79 S. Ct. 1335, 3 L. Ed. 2d 1434 (1959) (plurality opinion), and (2) whether "in doing [those acts, they] did no more than what was necessary and proper for [them] to do" as demarcated by the Constitution, see Neagle, 135 U.S. at 57, 10 S. Ct. at 666. As the Supreme Court explained, "a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." Butz v. Economou, 438 U.S. 478, 489, 98 S. Ct. 2894, 2902, 57 L. Ed. 2d 895 (1978). Indeed, it is a tautology that a federal officer's actions lie outside the scope of his authority when the officer fails to comply with the affirmative requirements of federal statutory or regulatory law, see id. at 489–91, 98 S. Ct. at 2902–03; Castro v. United States, 560 F.3d 381, 390–91 (5th Cir. 2009); United States Fid. & Guar. Co. v. United States, 837 F.2d 116, 120 (3d Cir.1988), and his actions fail to qualify as "necessary and proper" if committed in violation of the negative injunctions of the Constitution, see Butz, 438 U.S. at 489–91, 98 S. Ct. at 2902–03; Castro, 560 F.3d at 389; Medina, 259 F.3d at 225; Red Lake Band of Chippewa Indians, 800 F.2d at 1196; see also Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689–90, 69 S. Ct. 1457, 1461, 93 L. Ed. 1628 (1949); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170–71 (1803).

To be clear, this analysis examines whether the officer's acts have some

56

nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law. See Johnson, 254 U.S. at 56–57, S. Ct. at 16–17; Scherer v. Brennan, 379 F.2d 609, 611 (7th Cir. 1967) (citing Norton v. McShane, 332 F.2d 855, 858–859 (5th Cir.), cert. denied, 380 U.S. 981, 85 S. Ct. 1345, 14 L. Ed. 2d 274 (1964)). If the answer to these questions is yes, application of state law, to the extent it unavoidably conflicts with federal law, has no effect, as it would frustrate and impede the compelling federal interest of allowing federal officers to effectively discharge their duties. See Barr, 360 U.S. at 571, 79 S. Ct. at 1339 ("[O]fficials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government."); Free v. Bland, 369 U.S. 663, 666, 82 S. Ct. 1089, 1092, 8 L. Ed. 2d 180 (1962) ("The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail."); see also Osborn v. Bank of United States, 22 U.S. (Wheat. 738) 865–66, 6 L. Ed. 204 (1824).[72] If the

---

[72] In Osborn, Chief Justice Marshall explained:

An officer, for example, is ordered to arrest an individual. It is not necessary, nor

answer is no, state law may apply with full force, as no valid federal interest arises in protecting the <u>ultra vires</u> actions of a federal officer from liability.[73]

In this particular case, the United States may not be held liable under state tort law. Friedland and Lavenka's actions bear a substantial relation to the valid and preeminent federal interests of protecting our international borders, and, while carrying out their lawfully defined duties, they complied with the full spectrum of federal statutory, regulatory, and constitutional law and did no more than was essential to carrying out their duties.

It is also of great importance to note that there exists a direct conflict between state and federal law in this case. Initially, we note that relative to the

---

is it usual, to say that he shall not be punished for obeying this order. His security is implied in the order itself. It is no unusual thing for an act of congress to imply, without expressing, this very exemption from State control . . . . The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. It has never been doubted, that all who are employed in them, are protected, while in the line of duty; and yet this protection is not expressed in any act of Congress. It is incidental to, and is implied in, the several acts by which these institutions are created, and is secured to the individuals employed in them by the judicial power alone . . . ."

22 U.S. (Wheat.738) at 865–66.

[73] In <u>Mesa v. California</u>, the Supreme Court denied removal under the federal officer removal statute to two postal employees, 28 U. S. C. § 1442(a)(1), because they failed to establish that they were acting within the scope of their official duties and therefore, had no colorable federal defense to the state law charges of reckless driving and related offenses. 489 U.S. 121, 127–28, 109 S. Ct. 959, 963–64, 103 L. Ed. 2d 99 (1989). Because the federal employees' actions fell outside the scope of their federal duties, California's interest in vindicating the rights of its citizens did not frustrate any valid federal interest.

federal government the several states have a nominal, if not <u>de minimis</u>, interest in protecting the international borders of the United States, <u>see e.g.</u>, <u>State v. Coburn</u>, 683 A.2d 1343, 1347 (Vt. 1996) (implying that Vermont has little interest in having its law apply to an illegal border search claim in light of the exclusive federal interest in safeguarding the international border), and, moreover, application of state tort law to the facts of this case would impede an essential federal function by subjecting the United States to suit and possible liability even though its officers did only what was necessary and proper, as defined by federal law, while effectuating federal policy. Clearly, Customs officials would be deterred from acting as is practically and unavoidably required when encountering suspected narcotics couriers if they knew that by searching and temporarily confining a suspected drug courier they would expose their employer (the United States) to a tort action for assault, battery, and false imprisonment. Such a result would have profound negative consequences, as it would frustrate the compelling federal interests identified with effective border security by discouraging bold, vigorous, and necessary action. <u>See</u> <u>Almeida-Sanchez</u>, 413 U.S. at 272–73, 93 S. Ct. at 1539; <u>Gibbons</u>, 22 U.S. (9 Wheat.) at 211.

As <u>Neagle</u> and its progeny teach, state law liability simply cannot attach to the acts taken by federal officers in the course of their duties and committed in compliance with federal law, where such action was "no more than what was

59

necessary and proper for [the officer] to do" under the circumstances, if application of state law would impede an essential federal function.  Neagle, 135 U.S. at 57, 10 S. Ct. at 666.  The Supremacy Clause will simply not countenance such a result. See McCulloch, 17 U.S. (4 Wheat.) at 316 (explaining that state law cannot "retard, impede, burden, or in any manner control" the necessary execution of federal law).

In sum, since Friedland and Lavenka's conduct comported with federal law, Denson's state law tort claims of assault, battery, and false imprisonment, which are in direct conflict with the federal objectives we have identified in this FTCA case, are barred.  The judgment the district court entered in favor of the United States is, therefore, affirmed.

## IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

CARNES, Circuit Judge, concurring:

I write separately to flesh out the facts and circumstances that support this Court's conclusion that the customs inspectors did not violate plaintiff Janneral Denson's constitutional rights and also to discuss why that conclusion leads to judgment for the United States on the FTCA claims.[1]

## I.

Earlier this year we held in <u>Nguyen  v. United States</u>, 556 F.3d 1244 (11th Cir. 2009), that the United States has waived its sovereign immunity for the six tort claims listed in the proviso to 28 U.S.C. § 2680(h), when those claims arise from the actions of federal investigative or law enforcement officers.  In that case the three torts were false arrest, false imprisonment, and malicious prosecution.  <u>Id</u>. at 1246.  The facts, as they were presented at that stage of the proceeding, <u>id</u>. at 1248 n.1, were that a federal law enforcement officer had violated the Constitution by participating in the arrest and prosecution of the plaintiff without anything resembling probable cause, <u>id</u>. at 1248–49.  Because the tort claims in the <u>Nguyen</u>

---

[1] In regard to the FTCA claims, references to "the plaintiff" or "Denson" in this opinion include Denson's son, Jordan Taylor.  <u>See</u> Maj. Op. at 13 n.23.

case grew out of constitutional violations, we had no occasion to decide whether the § 2680(h) proviso has any application to tort claims that are not based on constitutional violations. See Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.") (citation omitted).

By the same token, we have no occasion in this case to decide how the FTCA might apply if the actions of the customs inspectors toward the plaintiff had been unreasonable or unconstitutional. Any implication in the majority opinion about how the FTCA might apply in those different circumstances is non-binding dicta. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 379, 114 S. Ct. 1673, 1675 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend. . . ."); Swann v. So. Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004) ("[T]he prior panel rule does not extend to dicta."); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring) ("[D]icta in our opinions is not binding on anyone for any purpose.").

The plaintiff's FTCA claims, which are set out in Count XI of the second amended complaint, are based on acts of the Customs Service Director and

62

inspectors working under his supervision that the plaintiff contends violated her rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  See 2nd Amend. Complaint at ¶ 145 ("The warrantless detention, searches, handcuffing, assault, battery, and forced medication and improper treatment of the plaintiffs by Defendants . . . were undertaken without legal basis and these actions were in violation of the laws of the State of Florida, and in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.").  The majority concludes that the acts of the customs inspectors were reasonable under the circumstances and therefore did not violate the Constitution.  After studying the record, I agree for reasons I will explain in Part II, infra.

After finding that the plaintiff's constitutional rights were not violated, the next question is whether her FTCA claims can survive anyway.  The reason that this question arises is because the FTCA incorporates state law, specifically each state's elements of battery, false imprisonment, false arrest, and assault.  See 28 U.S.C. § 2680(h); 28 U.S.C. § 1346(b)(1) (stating the general waiver of sovereign immunity applies "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"); Miles v. Naval Aviation Museum Found., Inc., 289 F.3d 715, 722 (11th Cir. 2002) ("The FTCA creates liability for the United States only if the act at issue is a tort in the

state where the conduct occurred.").

But the majority does not ask whether the plaintiff has alleged a tort other than those based on the alleged constitutional violations. It does not ask whether Florida law even allows a battery, false imprisonment, false arrest, or assault claim against a law enforcement officer when there is no constitutional violation. Instead, the majority sidesteps those questions because of its apparent belief that it does not matter what the plaintiff pleaded or what Florida law says. According to the majority, regardless of whether the plaintiff has pleaded any claims that do not depend on constitutional violations, or whether Florida law would allow them if she had, the Supremacy Clause would bar those claims anyway. Maj. Op. at 48. I do not think that is the best approach, although I agree that the plaintiff loses for two reasons.

First, as I read the plaintiff's second amended complaint, the basis for her FTCA claim is the custom inspectors' alleged violations of her Fourth, Fifth, Eighth, and Fourteenth Amendment rights. See 2nd Amend. Complaint at ¶ 145. By her own description of the FTCA claim, it depends on her allegation that the inspectors violated her constitutional rights. Because we determine that there was no constitutional violation, the FTCA claim fails. It is that simple.

Second, even if the plaintiff had pleaded tort claims that did not rely on constitutional violations by the federal officers, Florida law would not allow them.

64

Florida, like other states, recognizes a defense of justification which frees law enforcement officers from liability for actions reasonably taken in pursuit of their duty to enforce the law. See generally, e.g., City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (recognizing that Florida law provides for justifiable force by law enforcement officers, which is "a complete defense" to a battery or excessive force claim); City of Miami v. Albro, 120 So. 2d 23, 27 (Fla. 3d DCA 1960) ("[I]n order to recover [on a false imprisonment claim] it must be shown that the restraint was unreasonable and was not warranted by the circumstances."); id. ("Florida has recognized . . . that to cause a person's imprisonment for the purpose of vindicating public justice is not ordinarily actionable."). Because Florida law does not impose liability on law enforcement officers who act in a reasonable and constitutional manner in carrying out their duties, as a matter of state law the customs inspectors did not commit the torts that the plaintiff attempted to use as the basis for her FTCA claim. No state torts means no FTCA claim. See 28 U.S.C. § 1346(b)(1). It is that simple.

The majority, however, assumes that Florida law would permit tort claims against federal law enforcement officers for the lawful discharge of their duties in a reasonable and constitutionally permissible manner. That assumption is wrong. No one has cited, nor have I been able to find, any Florida decision that supports the notion that the state law claims the plaintiff has asserted against the United States as

65

FTCA claims could survive a finding that the customs inspectors acted reasonably and in a constitutional manner.

But on the basis of its incorrect assumption that Florida law would allow such a claim, the majority believes that it has rooted out "a direct conflict between state law and federal law." Maj. Op. at 57. Thus, the majority turns to the Supremacy Clause and dusts off decisions from the nineteenth century, all of which pre-date the FTCA, to establish the unstartling proposition that state law cannot be used to interfere with a federal officer's proper performance of federal law duties. See Majority Op. at Part III.B. That has been settled law for more than a hundred years. But all it says is that the Supremacy Clause prohibits a state from imposing liability on the United States for actions of its law enforcement officers that were taken in full compliance with federal law, including the federal Constitution.

That is obviously true, with one important caveat. The Supremacy Clause does not prevent federal law from permitting federal liability in these or any other circumstances. The sovereign is sovereign over questions of sovereign immunity. And the sovereign's will in this area of the law has been expressed in the FTCA, which incorporates state tort law *as a matter of federal law*. See 28 U.S.C. § 1346(b)(1); Miles, 289 F.3d at 722. The majority's assertion that there is a Supremacy Clause issue here relies on there being a "direct conflict" between state and federal law. See Maj. Op. at 57. But under the FTCA, there can be no such

66

conflict because the sovereign has incorporated state tort law into federal law to the extent stated in that statute. The supreme law of the land on this question is the FTCA.

Of course, the FTCA does not necessarily allow liability whenever state tort law freed of the United States' sovereign immunity might impose it. Whether a different part of the FTCA, possibly § 2680(a) (providing that sovereign immunity is not waived for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation"), might prohibit holding the United States liable for the constitutionally permissible actions of its officers is a question for another day. It is not a question for today because, as I have explained, Florida tort law does not impose liability in these circumstances even if the FTCA allowed it to do so and even if the plaintiff had pleaded a claim not dependent on a constitutional violation.

## II.

I do agree with the majority that reasonable suspicion existed to justify the custom inspectors' actions, but I reach that conclusion for some reasons that are not included in the majority's discussion. I begin by summarizing the facts that provided the customs inspectors with reasonable suspicion to believe that plaintiff Denson was carrying drugs internally.

Denson had in her possession a highly suspicious script of what to say when

questioned; she was arriving from Jamaica, a source country; she was traveling with only a carry-on bag and a purse; her trip was short (one full day and two nights); she could not provide her husband's address and phone number even though she said she had been visiting him; a third party whose name she did not know bought her ticket; the TECS system showed an alert for her (although the primary alert had expired); she was pregnant and there is a trend of using pregnant women as internal narcotics couriers because they cannot be x-rayed, making drugs carried in their digestive tracts more difficult to detect. See United States v. Vega-Barvo, 729 F.2d 1341, 1350 (11th Cir. 1984) ("Since swallowers [of drugs] follow a different mode of operation, customs agents' suspicions will be aroused by different factors. For example, suspicion will not focus on bulky dress . . . but on the traveler's inability to explain his or her trip." (citation omitted)). Articulable facts that were particularized to the place and person to be searched existed in this case throughout the series of increasingly invasive searches. See id. at 1349.

Each search ruled out the presence of drugs in a particular area or cavity of Denson's body, but the customs inspectors' reasonable suspicion that drugs were in her digestive tract was not dispelled until the monitored bowel movement search was completed. The earlier searches revealed no drugs, and each search removed any suspicion that Denson was carrying drugs in the specific area or cavity of the body where no drugs were found. See Brent v. Ashley, 247 F.3d 1294, 1300 (11th

68

Cir. 2001) ("[A]s a search progresses from a stop, to a pat-down search, to a strip search, an agent must reevaluate whether reasonable suspicion to justify the next level of intrusion exists in light of the information gained during the encounter."). After the initial stop (which included a pat down and luggage search), the restroom search, the pelvic exam, and the ultrasound uncovered no drugs and revealed that there were medical risks involved in searching further, the danger went up and reasonable suspicion had to be reassessed. See Vega-Barvo, 729 F.2d at 1348 (stating that "as medical danger increases because of a search procedure, so must the reasons for conducting the procedure").

Nonetheless, the customs inspectors' actions—all the way through the final monitored bowel movement search in the hospital—were justified because the facts, taken as a whole, supported their reasonable suspicion that Denson was carrying drugs in her digestive tract, and that suspicion was not allayed until after the bowel movement search. See United States v. Montoya de Hernandez, 473 U.S. 531, 541–42, 105 S. Ct. 3304, 3311 (1985) (holding that customs inspectors must have "a particularized and objective basis for suspecting the particular person of alimentary canal smuggling" (quotation marks omitted)); Vega-Barvo, 729 F.2d at 1350 ("The standard . . . must be whether under the 'totality of the circumstances' an experienced customs inspector would reasonably believe the traveler was carrying contraband.").

69

Furthermore, the manner of the searches was reasonable.  See United States v. Pino, 729 F.2d 1357, 1359–60 (11th Cir. 1984) ("The manner of [an internal] search is significant in determining its reasonableness").  Denson could not be x-rayed because she was pregnant, and based on the reasonable suspicion that she was carrying drugs in her digestive tract, it was permissible for customs inspectors to detain her at the hospital to monitor her bowel movements.  See United States v. Mosquera-Ramirez, 729 F.2d 1352, 1357 (11th Cir. 1984) ("The detention of persons at the border long enough to reveal by natural processes that which would be disclosed by a more expeditious x-ray search cannot be held to be an unreasonable seizure.  Nor can the search of the results of that natural process be held to be an unreasonable search."); United States v. De Montoya, 729 F.2d 1369, 1371 (11th Cir. 1984) ("Once Montoya refused an x-ray, her detention until natural bodily functions brought forth the fecal matter and stomach contents which the officials were entitled to search did not violate the Constitution. . . .").

Denson was at a hospital where doctors and nurses monitored her medical condition and made professional judgment calls about her high risk pregnancy.  The pelvic exam, the ultrasound, and the bowel search were all conducted in that hospital setting.  Cf. Evans v. Stephens, 407 F.3d 1272, 1281–82 (11th Cir. 2005) (en banc) (concluding that the constitutional violation was obvious in a non-emergency situation where a police officer took arrestees to a broom closet or

70

supply room and conducted body cavity searches in a degrading, forceful, and unsanitary manner).  Denson was prescribed a laxative to speed up the bowel search, a procedure we have permitted where customs inspectors reasonably suspect that someone is carrying drugs internally.  See United States v. Saldarriaga-Marin, 734 F.2d 1425, 1428 (11th Cir. 1984) ("Once the Customs officers developed reasonable suspicion that Marin was an internal carrier, they could permit nature to run its course or ask Marin to speed up the process by taking the laxative.").  The use of a laxative in this case, however, is troubling because Denson's pregnancy was high risk.  Even so, the hospital defendants were aware of that fact and they, not the customs inspectors, made the medical decision that the use of the laxative was appropriate.[2]  It was not administered in a violent or forced manner, and if Denson ultimately had refused to take the laxative, she could have been detained at

---

[2] Denson did present some expert testimony that the medical attention she received at Jackson Memorial Hospital was below the professional standard of care in the community and that it caused the premature birth of her baby. R:204:Ex. S (affidavit of Steven Pliskow, M.D., F.A.C.O.G.). Dr. Pliskow testified that a "breach of the standard of care significantly increased the likelihood of a premature delivery of Janneral Denson by emergency caesarean." Id. at 6. Dr. Pliskow testified in his deposition that Nurse Reynauld, Nurse Thompson, and Dr. Amadio signed an order prescribing the laxative to Denson, R:290 at 163, which "started the whole cascade" that caused pre-term delivery of Denson's baby. Id. at 175. In other words, Denson's own expert testified that the hospital defendants' actions in prescribing the laxative—not the actions of the customs inspectors—caused that injury.

Denson also submitted the affidavit of Susan Wheatley, R.N. R:204:Ex. T. Wheatley testified that the nurses at Jackson Memorial "failed to advise or inform customs officers of Janneral Denson's medical condition with respect to initiation of the 'protocol used for packers,' and 'U.S. Customs Standard of Care Form.'" Id. at 3. Thus Denson's own expert testified that the customs inspectors were not informed about how Denson's medical condition would be affected by the standard procedures used to search people suspected of being internal drug carriers.

71

the hospital until nature took its course.[3]  See Pino, 729 F.2d at 1360 ("In the absence of consent, the agents can detain you until nature reveals the truth or falsity of their suspicions.").  The customs inspectors reasonably suspected that Denson was carrying drugs in her digestive tract, and regarding the manner of the search they reasonably relied on the judgment of medical professionals about its safety.

## III.

I would affirm the district court's judgment on the FTCA claim because the customs inspectors had reasonable suspicion to conduct the searches, they acted reasonably, and there was no constitutional violation.  As a result, the state law torts the plaintiff alleged did not occur.  See Miles, 289 F.3d at 722.  I would affirm the district court's judgment on the plaintiff's Bivens claims because no constitutional violation occurred.  See Rodriguez v. Ritchey, 556 F.2d 1185, 1186 (5th Cir. 1977).[4]  I agree with the majority opinion's resolution of the issues involving the other claims.

A True Copy | Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

[3] In her initial brief Denson contended that she never consented to any examinations or treatment and that she was "forced" to take the laxative.  In her supplemental brief, however, she stated that she "simply gave up and drank the [laxative] in order to put an end to her ordeal."

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.